**UNITED STATES of America, Appellee,**

v.

**Virgilio Patricio FLORES, Appellant.**

**No. 82–1445.**

United States Court of Appeals,
Ninth Circuit.

Argued Sept. 11, 1984.

Submitted Dec. 28, 1984.

Decided Feb. 21, 1985.

John T. Bannon, Jr., Dept. of Justice, Washington, D.C., for appellee.

Carla M. Woehrle, Talcott, Vandevelde & Woehrle, Los Angeles, Cal., for appellant.

Before GOODWIN, SNEED, KENNE-DY, ANDERSON, TANG, SCHROEDER, PREGERSON, FERGUSON, NELSON, NORRIS, and BEEZER, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Appellant Flores was convicted under the Federal Gun Control Act, 18 U.S.C. § 922(e) [1], for failing to provide written no-

---

1. 18 U.S.C. § 922(e):

(e) It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped; except that any passenger who owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot, captain, conductor or operator of such

tice to a carrier before shipping firearms. Appellant contends that (1) the notice requirement violated his Fifth Amendment privilege against self-incrimination, and (2) the district court erred in holding that the offense does not require proof of specific intent. We reject appellant's contentions and affirm.[2]

## I. BACKGROUND

Beginning in early February, 1982, appellant began discussing the purchase of twenty-two revolvers with a gun shop clerk. Unknown to the appellant, the clerk was actually an undercover agent of the Bureau of Alcohol, Tobacco & Firearms. Appellant told the clerk that appellant would be taking the guns out of the country to Ecuador to be used by "the civilian guards." Appellant also told the clerk that the guns would be concealed in false bottoms of some luggage to be checked in as stowed baggage at an airline. Appellant purchased the twenty-two revolvers, and discussed with the clerk, on several occasions, the construction of false bottoms in two steamer trunks. Appellant told the clerk that he intended to pack clothing over the guns and, if there were any inquiries, he would say the trunks contained only clothing.

On February 27, 1982, appellant checked the two steamer trunks as baggage for travel on Ecuatoriana Airlines to Quito, Ecuador. At no time did appellant give oral or written notice to Ecuatoriana or the check-in personnel that the steamer trunks contained firearms. Appellant was not a licensed firearms dealer. Pursuant to a federal search warrant, the trunks were then searched, the twenty-two revolvers were found, and appellant was arrested.

The district court ruled that section 922(e) does not include an element of specific intent regarding knowledge of the duty to report a shipment of firearms, and that the reporting requirement does not violate appellant's Fifth Amendment privilege against self-incrimination. The dis-

trict court then found appellant guilty of violating section 922(e).

## II. ANALYSIS

Whether section 922(e) conflicts with the Fifth Amendment and/or requires proof of specific intent are questions of law requiring *de novo* review. *United States v. McConney,* 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### A. The Fifth Amendment

Appellant does not deny that he attempted to ship guns in the manner charged, nor that he failed to give the required notice to the carrier. Rather, he takes the position that by complying with the requirements of giving notice to the carrier, he would be compelled to confess to a number of criminal acts in violation of his Fifth Amendment rights.

 "Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one." *California v. Byers,* 402 U.S. 424, 427, 91 S.Ct. 1535, 1537, 29 L.Ed.2d 9, 17 (1971) (plurality opinion). A question such as this must be considered with great care, for it is our belief that the privilege against self-incrimination, as well as all other fundamental constitutional protections, may only be limited for the most substantial of reasons. *See United States v. Carlson,* 617 F.2d 518, 521 (9th Cir.1980), *cert. denied,* 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 468 (1980). We are confronted, in this situation, with a conflict between two critical interests: the government's need to regulate for the safety of its citizens, and the privilege against self-incrimination. This tension creates a serious question which, as the Supreme Court has said, "must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated light-

---

common or contract carrier for the duration of the trip without violating any of the provisions of this chapter [18 U.S.C. §§ 921 et seq.].

**2.** The panel opinion we disapprove is reported at 729 F.2d 593.

ly." *California v. Byers*, 402 U.S. 424, 427, 91 S.Ct. 1535, 1537, 29 L.Ed.2d 9, 17 (1971) (plurality opinion).

When balancing appellant's assertion of the Fifth Amendment privilege against the government's need for disclosures, we must consider the importance and character of the public interests, and the purposes of section 922(e). While it is true that the privilege must be given a "liberal construction in favor of the right it was intended to secure," *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951), we believe that the Fifth Amendment does not *always* demand substantial undercutting of valid and essential government regulation when the means to effect that regulation necessarily include disclosure of information which *could* lead to self-incrimination. *See California v. Byers*, 402 U.S. 424, 448, 91 S.Ct. 1535, 1548, 29 L.Ed.2d 9, 29 (1971) (Harlan, J., concurring).

The appellant relies on a line of Supreme Court decisions which struck down various reporting or registration requirements. He cites *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), and *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), as authority for his argument that section 922(e) must be struck down under the Fifth Amendment. These cases, however, and the statutory provisions they invalidated, are clearly distinguishable from the facts at bar.

In each of the cited cases, the Supreme Court found a notice requirement in an area of activity "permeated with criminal statutes," or directed at a group of persons "inherently suspect of criminal activities." In addition, compliance with requirements in each of the four cases produced an immediate or "real and appreciable" hazard of self-incrimination due to the fact that the statutes were largely designed to discover the respective defendant's involvement in the prohibited activity.

*Marchetti*, for example, struck down a statute that required anyone involved in wagering to register in detail with the Internal Revenue Service as a wagerer and pay an occupational tax. The lists of wagering taxpayers were then made readily available to state and federal authorities for prosecution. Wagering, however, is widely prohibited under both federal and state law. On similar grounds, the Court in *Grosso* overturned defendant's conviction for failure to pay an excise tax on wagering.

In *Haynes*, the defendant was required to register with the government, and pay an occupational tax, when transacting in certain firearms. The application of the statute was limited to only the types of weapons used principally by persons engaged in unlawful activities. The Court found that the registration requirements, which were extensive and included fingerprints and photographs, were almost entirely directed at those persons who gained possession of the proscribed weapons without complying with the Act's other requirements. A registration would, therefore, threaten immediate criminal prosecution.

Finally, *Leary* dealt with the Marijuana Tax Act which required defendant to identify himself as a transferee of marijuana who had not registered and paid an occupational tax. Once again, due to nationwide prohibitions on the drug and its use, such a registration was tantamount to a compelled guilty plea, and subjected defendant to real and appreciable dangers of prosecution, since the information gathered was to be given by the I.R.S. to state and local authorities upon request.

The statutory notice requirement at bar is different. Admittedly, the transport of firearms is an activity "permeated with criminal statutes." Yet, unlike the statutes in the *Marchetti* line of cases, the notice requirement at bar is not directed at a group of persons "inherently suspect of criminal activities." Section 922(e) is directed at a universe of people. It requires simple written notice to the carrier anytime firearms are being shipped to an unlicensed

person. Such a shipment cannot be said to be *per se* illegal. In fact, there are many situations in which firearms shipment to an unlicensed person is fully permissible, and in all such cases notice must be given to the carrier under section 922(e). We agree with the Fourth Circuit that, "[w]hile the notice requirements are marginally more stringent for persons delivering weapons illegally, this hardly raises the specter of the 'substantial hazards of self-incrimination' with which the Court has been concerned." *United States v. Wilson,* 721 F.2d 967, 974 (4th Cir.1983) (quoting *Marchetti v. United States,* 390 U.S. 39, 61, 88 S.Ct. 697, 709, 19 L.Ed.2d 889 (1968)).

The Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq.,* was an important step taken by Congress directed at aiding the several states in developing effective gun legislation, by way of limiting the travel of guns over state and national borders. State legislation had been ineffective up to that point, due to the ease with which firearms could be mail-ordered or transported in interstate or foreign commerce. 114 Cong. Rec. H21783 (daily ed. July 17, 1968) (statement of Rep. Celler).

While the majority of the Act sets forth requirements for licensing and transporting, section 922(f)³ prohibits any common carrier from knowingly shipping any firearm in violation of the Act. Section 922(e) was added to facilitate the carrier's responsibility by providing the carrier with notice of when firearms were being shipped to unlicensed persons. The carrier then must determine if the shipment is allowed under the Act.

In theory, if the carrier determines that the shipment would be in violation of the Act, it could simply refuse to ship the firearm. Such is the limit of the carrier's statutory duty. We can safely assume, however, and the government admitted at oral argument, that any number of carriers may cooperate with law enforcement officials by providing information in this area

although not required to do so. This possibility must be included in our balancing.

■ Nevertheless, it is significant that the purpose of the Act is a general regulatory one. The Act is not directed at catching illegal firearm exporters at the airport, but rather at helping the individual states regulate firearm distribution for the safety of their citizens by shutting off the flow of weapons across their borders. It is most significant that the primary purpose of section 922(e) is aiding the carriers in carrying out their own duties. *United States v. Wilson,* 721 F.2d 967, 974 (4th Cir.1983) (citing H.R.Rep. No. 1577, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 4410, 4420). "While Congress clearly intended the Act's disclosure requirements to be of some use in criminal proceedings, we regard these non-prosecutorial interests as substantial." *United States v. Dichne,* 612 F.2d 632, 640 (2d Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980).

In our judgment, therefore, the balancing of interests in this case swings away from the appellant. On the one hand, appellant may have been in violation of several laws, under which he may have risked incrimination by giving section 922(e) notice. Furthermore, there is some indication that some carriers might cooperate with law enforcement authorities by providing the incriminatory information. On the other hand, the important regulatory purpose of the Act, the neutral purpose of section 922(e), and the fact that the notice requirement is directed to the public at large, bring the balance down decisively in favor of the statute.

Our decision today is consistent with the results in other cases which have held various reporting requirements valid against Fifth Amendment challenges. *United States v. Des Jardins,* 747 F.2d 499 at 508–509 (9th Cir.1984) (holding currency re-

---

**3.** 18 U.S.C. § 922(f):

(f) It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm or ammunition with knowledge or reasonable cause

to believe that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter [18 U.S.C. §§ 921 et seq.].

porting statute valid under Fifth Amendment); *United States v. Grotke,* 702 F.2d 49 (2d Cir.1983) (holding currency reporting statute valid under Fifth Amendment); *United States v. Carlson,* 617 F.2d 518 (9th Cir.1980), *cert. denied,* 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 468 (1980) (denying defendant's attempt to take advantage of the privilege's protection to avoid filing a tax return which would disclose past tax law crimes); *United States v. Dichne,* 612 F.2d 632 (2d Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1317, 63 L.Ed.2d 760 (1980) (holding currency reporting statute valid as against Fifth Amendment claim); *United States v. Vaught,* 434 F.2d 124 (9th Cir.1970) (holding requirement to report and declare amphetamines when going through customs not a violation of Fifth Amendment); *Wynn v. United States,* 422 F.2d 1245 (9th Cir.1970) (holding tariff law requiring disclosure of marijuana being smuggled into United States not a violation of Fifth Amendment).

■■■ We hold that appellant's Fifth Amendment privilege against self-incrimination was not violated by, and cannot be claimed in connection with, the reporting requirement of 18 U.S.C. § 922(e).

Although our holding on the Fifth Amendment issue rests upon the balancing of interests just discussed, we are nevertheless struck by what we see as an absence of improper compulsion in this case. We are convinced this factor is entitled to consideration and lends further support to the conclusion we reach. Appellant may or may not have been guilty of a multitude of collateral crimes by virtue of his attempt to conceal and ship the firearms; however, no one forced appellant to attempt the shipment, and only by so shipping was appellant required to make any disclosure. It is our belief that appellant had reasonable and sensible choices. He could reasonably have chosen not to ship the firearms, there-

by not invoking the notice requirement and likewise not disclosing any collateral violations of law.

We recognize that the privilege, as one of the principles of a free government, is intended to shield the guilty as well as the innocent. Justice Stewart wrote that "the basic purposes that lie behind the privilege ... do not relate to protecting the innocent from conviction, but rather to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution 'shoulder the entire load.'" *Tehan v. Shott,* 382 U.S. 406, 415, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966). At the same time, however, there is a difference between using the privilege as a shield against inquisitorial and unfair government practices and using it as a sword to carve a path through the laws of the land. Unfortunately, the line between the two is often less than crystal clear.

A study of the history of the privilege, in an attempt to clarify its intended scope, is inconclusive. We know that the privilege originally arose in England to combat the *ex officio* oaths used by the ecclesiastical courts whereby people were called, under penalty of death, to answer broad questions before any charges were brought.[4] The privilege evolved over time and was eventually carried, in various forms, to the American colonies. At its inclusion in the Bill of Rights, very little discussion took place. Some commentators have opined that the lack of discussion by the founders was because the privilege was so deeply accepted and taken for granted that it needed no explanation.[5] To be sure, the privilege in the first days of our nation was much more limited. than it is today.[6] But, commensurate with the longevity of our entire Constitution, a treatment of the constitutional commands as living institutions has enabled the privilege to be, as Judge

---

**4.** McCormick on Evidence 279 (1984); Friendly, *The Fifth Amendment Tomorrow: The Case for Constitutional Change,* 37 U.Cin.L.Rev. 671, 677 (1968).

**5.** Thompson, *Judge Friendly's Amendment to the Fifth Amendment: A Comment on a Recent Crit-*

*icism of the Supreme Court,* 38 U.Cin.L.Rev. 488, 493 (1969) (citing Levy, Origins of the Fifth Amendment, The Right Against Self-Incrimination, at 430 (1968)).

**6.** Thompson, *supra,* at 491; *see also* McCormick, *supra,* at 282–288.

Friendly said, "responsive to the particular needs and problems of the time."[7] Throughout the privilege's evolution, however, runs the basic idea that one's constitutional right in this regard is to not be improperly *compelled* to incriminate one's self. At no time has the privilege granted one a right to violate the law.

While making these observations, we are mindful of the discussion in *Marchetti v. United States.* In that case, the Supreme Court said that "[t]he question is not whether petitioner holds a 'right' to violate state law, but whether, having done so, he may be compelled to give evidence against himself." 390 U.S. at 51, 88 S.Ct. at 704. The context of this statement, however, was in overruling the reasoning of *Lewis v. United States*, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955), and *United States v. Kahriger*, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953). *Lewis* and *Kahriger* had employed a chronological antecedent choice analysis to uphold the same type of statute struck down in *Marchetti.* The critical distinction between the statutes in *Lewis, Kahriger*, and *Marchetti* and the statute at bar is, as previously mentioned, the purpose and direction of the statutes. The statutes struck down in the *Marchetti* line of precedent were carefully drafted to obtain evidence from persons involved in illegal activities for use in their prosecution. Moreover, those statutes were directed at a "highly selective group inherently suspect of criminal activities." As we have noted, the same is not the case with the statute at bar. We do not believe that the instant statute is the type of "ingeniously drawn legislation" worried about in *Marchetti.* "The privilege against self-incrimination does not bar the Government from establishing every program or scheme featured by provisions designed to secure information from citizens to accomplish proper legislative purposes." *Marchetti v. United States*, 390 U.S. at 72, 88 S.Ct. at 716 (Brennan, J., concurring). Accordingly, we do not find *Marchetti* and its progeny to be binding in this case.

We are drawn to the conclusion, then, that the appellant used the privilege as a sword, and was not, therefore, improperly compelled to incriminate himself. This belief is bolstered by our reading of the recent Supreme Court decision in *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. ——, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). In rejecting a Fifth Amendment challenge to a requirement that young college men seeking financial aid certify compliance with draft registration laws, the Court said, "[s]ince a nonregistrant is bound to know that his application for federal aid would be denied, he is in no sense under any 'compulsion' to seek that aid. He has no reason to make any statement to anyone as to whether or not he has registered." 468 U.S. at ——, 104 S.Ct. at 3358. Likewise, in this case, since the defendant is bound to know that his shipment of guns would be denied and he may risk discovery of any collateral crimes, he is under no compulsion to ship the guns and has no reason to make any disclosure.

Neither history nor precedent requires this result; but if history and precedent teach one thing, it is that the flexibility and responsiveness of the privilege require a close scrutiny of the facts and circumstances of each case. The particular need and problem today, to which the privilege should be responsive, is the attempt to use the privilege as an offensive tool in situations where there is no improper compulsion. Important and effectively neutral governmental regulations should not be forced to bow to these tactics. The facts and circumstances surrounding this case demonstrate clearly that appellant had fair and reasonable choices, and was by no means improperly compelled.[8]

---

7. Friendly, *supra*, at 678.

8. *Minnesota Public* distinguishes *Marchetti* and *Grosso* on the basis that the "very filing necessarily admitted illegal gambling activity." 468 U.S. at —— n. 16, 104 S.Ct. at 3359 n. 16. We think essentially the same factual distinction applies in this case. As pointed out, the written notice to the airline does not "necessarily" admit illegal activity.

## B. The Intent

Appellant alleges that the word "knowingly" in the first line of section 922(e) establishes an element of specific intent that requires the government to prove that appellant had knowledge of the duty to provide written notice to the carrier. We disagree.

■ A plain reading of the statute leads to the conclusion that "knowingly" modifies "to deliver or cause to be delivered." Such a reading would indicate a knowing act as the required element, not a specific intent to violate the statute. It seems logical that "knowingly" would be included as it is in the statute in order to prevent the conviction of a person who has delivered to a carrier a parcel which contains, unknown to that person, a firearm. On the other hand, there is nothing in the section to indicate a Congressional purpose to require an element of specific intent as the appellant alleges. Further, the absence of words such as "intent" and "willfully," which traditionally accompany specific intent crimes, supports our conclusion. "Congress would have included similar language ... had it intended to require proof of willful conduct." *United States v. Launder,* 743 F.2d 686, 692 (1984) (Choy, J., dissenting).

■ It is possible that scienter is required regardless of the absence of an express requirement in the section. To determine if it is so required, this court has used a two-question test under the guidance of *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). The questions to be resolved are (1) is the nature of the act innocent or bad, and (2) is the policy behind the statute one of regulation with an emphasis on achievement of a social benefit such as public safety or one of punishment for acts motivated by some corrupt motive. *See United States v. Pruner,* 606 F.2d 871, 873 (9th Cir.1979) (citing *Freed,* 401 U.S. at 609, 91 S.Ct. at 1118). The crux of the test is that if the act done by the accused is itself a "bad" act and if the policy behind the statute is regulatory, then scienter need not be proven.

There can be no question that concealing weapons under false bottoms in steamer trunks for shipment out of the country is a bad act. The very manner in which it was attempted attests to the nature of the act. Appellant evinced a recognition that it was not innocent when he planned to lie about the contents of the trunks, if asked.

Secondly, there can be no question that the policy behind the Gun Control Act is regulatory with an emphasis on achievement of public safety. This was squarely the finding of our court in *Pruner,* 606 F.2d at 874.

We conclude, therefore, that section 922(e) is a general intent statute. This was also the conclusion of the Fourth and the Eighth Circuits when dealing with the questions presented by this appeal. *United States v. Wilson,* 721 F.2d 967, 973 (4th Cir.1983); *United States v. Udofot,* 711 F.2d 831, 835–37 (8th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983).

For the reasons set forth in this opinion, the decision by the district court is

AFFIRMED.

GOODWIN, SNEED, KENNEDY, TANG, NELSON, NORRIS and BEEZER, Circuit Judges, concurring.

PREGERSON, Circuit Judge, dissenting, with whom SCHROEDER and FERGUSON, Circuit Judges, join in the dissent:

I dissent from both of the majority's holdings.

## I. *The Fifth Amendment*

The majority correctly sets out the difficult standard that must be met before the government will be allowed to compel an individual to disclose potentially incriminating information. Although the majority acknowledges that the privilege against self-incrimination may be limited only for the most substantial of reasons, it concludes, nevertheless, that the compelled disclosure required by 18 U.S.C. § 922(e) (1982) is not unconstitutional though "[n]either history nor precedent require this re-

sult." Majority Opinion at 1504. Because I believe that Fifth Amendment protections should not be lightly dismissed, I dissent.

In applying the privilege, we must determine "whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *United States v. Apfelbaum*, 445 U.S. 115, 128, 100 S.Ct. 948, 956, 63 L.Ed.2d 250 (1980) (citation omitted). The Supreme Court set down the specific tests we apply in *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and in a line of cases following *Marchetti*. We are required to consider whether the claimant is subject to (1) comprehensive proscriptions of activity, *Marchetti v. United States*, 390 U.S. 39, 48, 88 S.Ct. 697, 702, 19 L.Ed.2d 889 (1968); (2) prohibitions "directed at a highly selective group inherently suspect of criminal activities," *Haynes v. United States*, 390 U.S. 85, 98, 88 S.Ct. 722, 731, 19 L.Ed.2d 923 (1968) (quoting *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 79, 86 S.Ct. 194, 199, 15 L.Ed.2d 165 (1965); and (3) statutory requirements for disclosure of "information which [the accused] might reasonably suppose would be available to prosecuting authorities, and which would surely prove a significant 'link in a chain' of evidence tending to establish ... guilt," *Marchetti*, 390 U.S. at 48, 88 S.Ct. at 703. Similar "hazards of prosecution under state law ... might support a proper claim of privilege" as well. *Haynes*, 390 U.S. at 99 n. 13, 88 S.Ct. at 731 n. 13.

The majority acknowledges that section 922(e) is part of a comprehensive criminal statutory scheme that controls the licensing, sale, transportation, and importation of firearms. Majority Opinion at 1501–02. The majority argues, however, that section 922(e) is not directed at "a highly selective group inherently suspect of criminal activities" as was true in the *Marchetti* line of cases, but rather at the general population of people affected in *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) (stop and report statute applied to all

drivers involved in accidents in California). I disagree.

Because section 922(e) is part of a comprehensive criminal statute and because transport of firearms is an activity in an area "permeated with criminal statutes," *Albertson*, 382 U.S. at 79, 86 S.Ct. at 199, it is reasonable to conclude that almost all transport of firearms involves criminal activities. Moreover, section 922(e) applies only when a shipment of firearms is made to an unlicensed person. Those engaged in such activities are inherently suspect. In fact, an unlicensed person shipping firearms in interstate commerce has potentially violated a myriad of laws, including: 18 U.S.C. §§ 922(a)(1) and (5) (1982) (limiting firearms transactions to licensed individuals); 22 U.S.C. § 2778 (1982) (prohibiting export of firearms on the United States Munitions List); 22 C.F.R. § 122.01 (1984) (requiring firearms exporters to register with Secretary of State); *id.* §§ 123.01, 127.01 (firearms licensing requirements); 27 C.F.R. § 178.30 (1984) (prohibiting non-intrastate disposition of firearms by nonlicensee); *id.* § 178.31 (similar to 18 U.S.C. § 922(e)); Cal.Penal Code § 12070 (West 1982) (state firearms licensing requirement); and Cal.Penal Code § 12025 (West 1982) (carrying a weapon concealed in vehicle or on person).

Admittedly, the Gun Control Act provides exceptions allowing some lawful shipments of firearms from or to unlicensed persons.[1] But even these limited exceptions do not remove the threat of self-incrimination section 922(e) poses. Exceptions also existed in several statutes the Court struck down as violating the Fifth Amendment. *See Marchetti*, 390 U.S. at 44–45, 88 S.Ct. at 700–702 (exceptions to illegality of gambling in some state statutes); *Haynes*, 390 U.S. at 89, 93, 88 S.Ct. at 726, 728 (exceptions to registration requirement of 26 U.S.C. § 5841). Undoubtedly, in the vast majority of cases, firearms shipment by unlicensed persons is illegal. To require those persons to reveal their intended illegal action would clearly subject

---

1. *See, e.g.,* 18 U.S.C. § 922(a)(5)(A) and (B).

them to a substantial hazard of self-incrimination.

An examination of the statute's purpose bolsters the conclusion that section 922(e) is directed at a highly suspect group. Far from being a general regulatory statute directed at all persons as in *Byers*, section 922(e) has no other purpose than to facilitate the discovery of criminal activity.[2] The legislative history of section 922(e) indicates that its purpose was to assist carriers in complying with section 922(f) which forbids them from knowingly transporting firearms in violation of the Gun Control Act.[3] *See* H.R.Rep. No. 1577, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 4410, 4420. Section 922(f) imposes liability on carriers only when they ship with "knowledge or reasonable cause to believe" that shipment would be in violation of the statute. If the carrier does not know that it is transporting firearms, then it has not violated section 922(f). Therefore, the carrier's compliance with section 922(f) is not dependent on the notice that section 922(e) requires.

Regardless of the purpose of section 922(e), it in fact serves as an aid to law enforcement. Because of the statutory reporting requirements imposed on them, carriers routinely turn over to appropriate authorities information on illegal arms shipments.[4] *Illinois v. Andreas*, 463 U.S. 765, 103 S.Ct. 3319, 3323 n. 2, 77 L.Ed.2d 1003 (1983). Air carriers, in particular, are subject to a wide variety of reporting requirements. *See, e.g.*, 14 C.F.R. § 249 (1984) (requiring air carriers to preserve certain security and other records); *id.* § 107.23 (requiring airport operators to record, among other things, the number and type of firearms and explosives identified through screening procedures); 44 C.F.R. § 401.3 (1982) (requiring officials subject to air safety regulations to submit reports on the shipping of arms and ammunition to the Assistant Secretary for Domestic and International Business); *id.* § 401.4 (requiring maintenance of such records for two years). *See also United States v. Davis*, 482 F.2d 893, 895, 897 (9th Cir.1973); *United States v. Henry*, 615 F.2d 1223, 1228 (9th Cir.1980).

If truly regulatory, and not penal, the statute could easily have been designed to notify carriers of arms shipments without subjecting the persons giving notice to the risk of self-incrimination. Following the Supreme Court's decision in *Haynes*, invalidating a registration requirement designed to facilitate the payment of a tax by those purchasing certain firearms, Congress enacted a use immunity provision preventing the use in criminal proceedings of evidence revealed by firearm registration. 26 U.S.C. § 5848 (1982) (originally enacted as Act of Oct. 22, 1968, Pub.L. No. 90–618, § 201, 82 Stat. 1232); *see also United States v. Freed*, 401 U.S. 601, 605–06, 91 S.Ct. 1112, 1116–17, 28 L.Ed.2d 356 (1971) (upholding revised statute containing use immunity provision against constitutional attack). A use immunity provision is not inconsistent with the goal of regulating the flow of weapons over state and national borders. Therefore, if Congress designed section 922(e) solely to further regulatory purposes, it would have included a use immunity provision similar to that in 26 U.S.C. § 5848. In the absence of such a provision and because section 922(e) is not needed to

---

**2.** At oral argument the government was unable to provide information on how often shippers give notice under section 922(e), how often notice revealed legal shipments, how often notice revealed illegal shipments, and how many people, if any, were prosecuted when illegal shipments were revealed. Thus, section 922(e)'s usefulness in serving a "regulatory" purpose is unclear.

**3.** Section 922(f) provides:
> It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm

or ammunition *with knowledge or reasonable cause to believe* that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter.

(Emphasis added.)

**4.** Similarly, *Grosso v. United States* reports that the I.R.S. routinely turned over information regarding wagering activities to prosecuting authorities although not required to do so. 390 U.S. 62, 66, 88 S.Ct. 709, 712, 19 L.Ed.2d 906 (1968).

further the carriers' statutory responsibilities under section 922(f), the section can only be viewed as a criminal statute designed to ferret out Gun Control Act violators by requiring them to incriminate themselves.

Finally, the majority questions the "compulsion" actually required by section 922(e), concluding that invocation of the privilege allows the defendant to use the fifth amendment as a sword to escape prosecution rather than as a shield against unfair government practices. Although recognizing that the privilege protects the guilty as well as the innocent, the majority's analysis essentially amounts to an argument that if a person is innocent (i.e., decides not to ship guns in violation of the law) he will never risk being required to make incriminating disclosures.[5] The Supreme Court rejected this reasoning in *Marchetti* holding that:

> The constitutional privilege was intended to shield the guilty and imprudent as well as the innocent and foresighted; if such an inference of antecedent choice were alone enough to abrogate the privilege's protection, it would be excluded from the situations in which it has historically been guaranteed, and withheld from those who most require it.

390 U.S. at 51, 88 S.Ct. at 704. There is no rational basis for distinguishing this case from *Marchetti*. Both cases involve statutes requiring a person who is part of a highly selective group inherently suspect of criminal activities to reveal potentially incriminating information. Even if section 922(e) was not specifically designed to elicit this information, its effect is just as insidious as the "ingeniously drawn legislation" condemned in *Marchetti*.

## II. *Intent*

Apart from section 922(e)'s constitutional deficiency, the conviction should be reversed on the separate ground that the district court erred in holding that the offense does not require proof of specific intent. To prove a violation of section 922(e), I believe the government must show that the accused knowingly failed to notify the carrier regarding a firearms shipment. "The existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *United States v. United States Gypsum Co.*, 438 U.S. 422, 436, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978) (quoting *Dennis v. United States*, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951)). Absent clear legislative intent to eliminate a mens rea requirement, courts should be reluctant to interpret criminal statutes to do so. *United States v. Launder*, 743 F.2d 686, 689 (9th Cir.1984); see also *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952).

Section 922(e), unlike statutes construed by cases the majority relies on,[6] is not a statute that on its face imposes strict criminal liability on a person who delivers firearms to a carrier without first notifying it of the shipment.[7] Rather, section 922(e)

---

**5.** The majority relies on the recent case of *Selective Service System v. Minnesota Public Interest Research Group*, —— U.S. ——, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), to support its conclusion that section 922(e) does not *compel* incrimination. While some of the language in *Selective Service* might cast doubt on the reasoning of *Marchetti*, it is significant that the Court did not overrule *Marchetti*, and in fact, found it distinguishable on its facts. *Compare* 104 S.Ct. at 3358 *with* 104 S.Ct. at 3359 n. 16. *Selective Service* is distinguishable from both this case and *Marchetti*. *Selective Service* involved conditions imposed on benefits (financial aid) dispensed by the federal government.

**6.** *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (construing amend-

ments to the National Firearms Act, 26 U.S.C. §§ 5841–5872); *United States v. Pruner*, 606 F.2d 871 (9th Cir.1979) (construing 18 U.S.C. § 922(h)(1)).

**7.** The majority emphasizes that the word "willfully" is not present in the statute. Yet there is nothing magical about the use of the word willfully. The standard federal jury instruction by Devitt & Blackmar defines "knowingly" as voluntarily and intentionally doing or omitting to do a proscribed act. The instruction also points out that "[a]s stated before, with respect to an offense such as charged in this case, specific intent must be proved beyond a reasonable doubt before there can be a conviction." 1 E. Devitt & C. Blackmar, *Jury Instructions*, §§ 14.-03, 14.04, 14.05 (3d ed. 1977).

explicitly proscribes knowing delivery without notice. Although the word "knowingly" immediately precedes the words "to deliver," a plain reading of the statute indicates that "knowingly" modifies the statute's crucial language, i.e., "knowingly to deliver ... any package ... in which there is any firearm or ammunition without written notice to the carrier....", not simply the mere act of delivery.[8] This conclusion is strengthened by the fact that the focus of section 922(e) is on the notice requirement, not the mere act of delivery, which is extensively governed by other sections of the Gun Control Act.[9] In short, a reasonable reading of section 922(e) indicates that "knowingly" refers to the statute's notice requirement.[10]

In other cases where a statute punishes a person's failure to make a report, courts have generally required a showing of scienter. *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) ("Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process."); *United States v. Chen*, 605 F.2d 433, 435 (9th Cir.1979) ("There was sufficient evidence to establish that defendant knew she was carrying more [than the statutory amount], but the evidence that defendant knew she must file a report was woefully insufficient."); *United States v. Granda*, 565 F.2d 922, 926 (5th Cir.1978) ("[T]he failure to report, when one is without knowledge of the reporting requirement, must be classified as a nonfeasance as opposed to a 'misfeasance.' "); *United*

*States v. San Juan*, 545 F.2d 314, 318 (2d Cir.1976) ("Without proof of any knowledge of, or notice to [defendant] of the [currency] reporting requirements, a jury could not determine beyond a reasonable doubt that she had the requisite willful intent."). Courts have also required a showing of scienter in cases where weapons are involved. See *United States v. Herbert*, 698 F.2d 981, 986–87 (9th Cir. 1983) (construing 26 U.S.C. § 5861(d) and (e), prohibiting the possession and transfer of unregistered firearms); *United States v. Lizarraga-Lizarraga*, 541 F.2d 826 (9th Cir.1976) (construing 22 U.S.C. § 1934, prohibiting export of ammunition from the United States into the Republic of Mexico). Nothing in section 922(e) directs us to depart from our usual practice of requiring scienter where a statute punishes failure to report.

A reasonable reading of the Gun Control Act does not compel the conclusion that Congress intended to eliminate a specific intent requirement from section 922(e). At the very least, the section is ambiguous.[11] This court, therefore, should not reach out to hold that section 922(e) does not require specific intent. Rather, we should follow the Supreme Court's admonition: "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. United States Gypsum Co.*, 438 U.S. at 437, 98 S.Ct. at 2873 (quoting *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). Accordingly, I would require the

---

8. *See United States v. Marvin*, 687 F.2d 1221, 1226 (8th Cir.1982) (construing "knowingly" in 7 U.S.C. § 2024(b) as modifying the entire phrase, not merely the verb "to use" which it immediately precedes), *cert. denied*, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983).

9. Some sections punish mere delivery without knowledge. *See, e.g.,* 18 U.S.C. §§ 922(a)(1) and (4), and (g). Others contain a knowledge requirement. *See, e.g.,* 18 U.S.C. § 922(i) and (k).

10. In holding that the section does not require proof of specific intent, *United States v. Wilson,* 721 F.2d 967, 973 (4th Cir.1983), and *United States v. Udofot,* 711 F.2d 831, 835–37 (8th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 245, 78

L.Ed.2d 234 (1983), failed to consider that the focus of section 922(e) is on notice to the carrier, not on mere delivery. Therefore, we should decline to follow these out of circuit cases.

11. LaFave & Scott addressed this problem in the context of discussing the word "knowingly" in a "blue sky" law:

> As a matter of grammar the statute is ambiguous; it is not at all clear how far down the sentence the word "knowingly" is intended to travel—whether it modifies "sells," or "sells a security," or "sells a security without a permit."

W. LaFave & A. Scott, *Criminal Law,* § 27 (1972).

government to prove specific intent, and I would reverse the conviction.