[No. C032572. Third Dist. June 15, 2001.]

ROBERT A. MACHADO et al., Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants
and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

## COUNSEL

Curtis & Arata, Edgar H. Hayden, Jr., and Matthew R. Berrien for Plaintiffs and Appellants Manuel Borges, Jeanette Borges, Frank V. Borba and Manjean Holsteins.

Damrell, Nelson, Schrimp, Pallios & Ladine, Fred A. Silva and Lisa W. Chao for Plaintiffs and Appellants Robert A. Machado, David Machado, Frank Machado, Mabel Machado and Machado & Machado Dairy.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Tracy L. Winsor, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**HULL, J.**—In this appeal, plaintiffs Robert A. Machado, David A. Machado, Frank R. Machado, Mabel G. Machado, and Machado & Machado Dairy (collectively referred to as the Dairy) challenge the issuance of a cleanup and abatement order. The Regional Water Quality Control Board (RWQCB) issued this order because the Dairy was discharging manure and wastewater into a ditch that flowed into a drainage system and then into the Sacramento-San Joaquin Delta.

The Dairy asserts (1) due process required a hearing before the cleanup and abatement order could be issued, (2) the order was vague and included remedies that exceeded the authority of the RWQCB, and (3) the reports required as part of the cleanup and abatement order threatened the Dairy's right against self-incrimination.

The trial court rejected each of these claims and denied the Dairy's petition for writ of mandate. We affirm.[1]

### FACTS AND PROCEDURAL HISTORY

Discharges into the state's water system are usually regulated through the issuance of waste discharge requirements (WDR's). (See generally Wat. Code, §§ 13260, 13263, 13264 [all further undesignated statutory references are to the Water Code].) However, in 1982, the RWQCB waived WDR's for certain types of waste discharges, including confined animal wastes.[2] This exemption applied only if the discharger complied with RWQCB guidelines.

The Dairy violated these guidelines by discharging wastewater into a reclamation district drain which flowed into the delta. Therefore, in November 1991, the RWQCB issued WDR order No. 91-214, directing the Dairy to take certain measures to protect surface and groundwater. These WDR's included a monitoring and reporting program, which required the Dairy to "inspect waste holding and disposal areas and note any discharge off of property under the control of the [Dairy]. Inspections will be made daily

---

[1]This case initially involved similar cleanup and abatement orders directed to two other dairies and their owners. However, those dairies have since dismissed their appeals, and this case involves only "Cleanup and Abatement Order No. 98-719," issued to the Machado & Machado Dairy and its owners/operators.

[2]This order is the subject of a motion for judicial notice. The People's first motion for judicial notice, filed March 2, 2000, is denied as moot, as the documents contained therein are also included in its supplemental motion for judicial notice, filed March 8, 2000. We grant the supplemental motion for judicial notice as to exhibit A (RWQCB meeting agendas and the 1982 order), but deny as moot the motion as to exhibit B (judgment relating to one of the parties dismissed from this appeal).

when wastewater and/or manure are being applied to cropland and weekly during other periods. The results of all inspections will be recorded for submittal with the required reports." The monitoring program also required the Dairy to submit annual reports to the RWQCB, and to notify the RWQCB "within 72 hours of any off-property discharge of facility wastewater or manure."

The Dairy did not submit any of the required reports, nor did it ever report any off-property discharge.

In March 1998, a RWQCB inspector noticed wastewater from the Dairy flowing into a roadside ditch. The ditch discharges into a drainage system that empties into the Walthall Slough and then into the delta.

The RWQCB determined this discharge "threaten[ed] to create a condition of pollution or nuisance" and violated the WDR's. The RWQCB therefore issued cleanup and abatement order No. 98-719, which required the Dairy to (1) immediately abate any discharge of "manured wastewater" into surface waters, (2) operate in compliance with the previously issued WDR's, (3) submit an annual report for 1997 and submit future reports in a timely manner as required by the WDR's, (4) conduct daily inspections of waste holding areas and cropland being irrigated with wastewater and report to the RWQCB any off-property discharge of wastewater containing manure, as required by the WDR's.

The cleanup and abatement order also required the Dairy to prepare and submit plans for modifying its wastewater distribution system and other portions of the dairy waste management system to prevent off-property discharges of wastewater containing manure. The Dairy was then to submit reports outlining the completed modifications and any operational changes necessary to ensure the Dairy complied with standards for waste discharge at confined animal facilities. (See generally Cal. Code Regs., tit. 27, §§ 22560-22565.)

Finally, the cleanup and abatement order required the Dairy to reimburse state and federal agencies "for reasonable costs associated with oversight of actions taken in response to this Order."

The Dairy sought review with the State Water Resources Control Board (State Board), but that agency dismissed the petition, finding the Dairy "fail[ed] to raise substantial issues that are appropriate for review . . . ."

The Dairy then filed a petition for writ of mandate or prohibition in the trial court, seeking to have the cleanup and abatement order vacated. The

Dairy raised various due process claims, asserting it should have been afforded a hearing before the order issued. It argued the order was overbroad, vague, and unduly burdensome. The Dairy contended the orders "would require [it] to waive [its] constitutional rights, including [its] fifth amendment rights when they require [the Dairy] to make reports that might divulge conduct that could result in criminal charges against [itself]." The Dairy further disputed the findings in the cleanup and abatement order and questioned whether the order was needed or justified.

The trial court found the order sufficiently specific and not overbroad, and it rejected the Dairy's Fifth Amendment concerns. The court also concluded due process rights were satisfied by providing an opportunity for a hearing after the issuance of the cleanup and abatement order. However, the court ordered that the Dairy, at its request, was entitled to a hearing before the RWQCB.

The Dairy appeals from the ensuing judgment. While this appeal was pending, a hearing was held before the RWQCB, the board affirmed the issuance of the cleanup and abatement order. No appeal was taken from the decision, and we therefore are not concerned with the factual basis for the RWQCB order. Instead, our review is limited to the constitutional and legal questions raised in the trial court. We conclude the trial court properly rejected the Dairy's claims, and affirm the judgment.

DISCUSSION

I

*Right to Hearing*

The Dairy contends its due process rights were violated because it was not afforded a hearing before the issuance of the cleanup and abatement order. Due process does not require such a hearing.

" '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' [Citation.] Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. [Citations.] More precisely . . . identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including

the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews v. Eldridge* (1976) 424 U.S. 319, 334-335 [96 S.Ct. 893, 902-903, 47 L.Ed.2d 18, 33] (*Mathews*).)

 Here, the balancing of these three factors demonstrates that the Dairy was afforded process of law.

The cleanup and abatement order does not impose criminal or civil penalties, nor does it shut down the Dairy or otherwise prevent its operation. Its effect is much more limited. The order prohibits the discharge of polluted water, requires inspections to ensure compliance with previously issued WDR's, and calls for modifications of the wastewater distribution system to prevent any further unlawful discharges. While these measures create obligations for the Dairy, they do not affect the fundamental nature of its business.

Turning to the second *Mathews* factor, we conclude the hearing procedures provided by the Porter-Cologne Water Quality Control Act (§ 13000 et seq.) minimize the risk of an erroneous deprivation of the Dairy's interests.

Under section 13320, subdivision (a), a party aggrieved by an order of a regional water quality control board may petition the State Board for review. The Dairy complains that the protections afforded by this review are somewhat illusory because review is discretionary. However, if the State Board denies review, the issued order is deemed final and the party may challenge the order through a petition for mandate in the trial court. (*People ex rel. Cal. Regional Wat. Quality Control Bd. v. Barry* (1987) 194 Cal.App.3d 158, 177 [239 Cal.Rptr. 349]; see § 13330, subd. (b).)

 As the United States Supreme Court noted, "The Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations. [Citation.] . . . [Citation.] [W]hen prompt postdeprivation review is available for correction of administrative error, we have generally required no more than that the predeprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be." (*Mackey v. Montrym* (1979) 443 U.S. 1, 13 [99 S.Ct. 2612, 2618, 61 L.Ed.2d 321, 331-332] (*Mackey*).) Moreover, in assessing what process is due, a reviewing court must give substantial deference to the good faith judgment of the agency that its procedures afford fair consideration of a party's claims. (*Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 289 [58 Cal.Rptr.2d 721]; *Mathews, supra*, 424 U.S. at p. 349 [96 S.Ct. at pp. 908-909, 47 L.Ed.2d at p. 41].)

The cleanup and abatement order was issued only after a RWQCB employee observed unlawful discharges from the Dairy. A letter was written to the Dairy, notifying it of this discovery; the letter provided the name and phone number of someone to contact should the Dairy wish to discuss the matter. The Dairy therefore had an informal opportunity to dispute the RWQCB's determination before the order issued. As in *Mackey*, "the risk of erroneous observation or deliberate misrepresentation of the facts by the reporting officer in the ordinary case seems insubstantial." (*Mackey, supra*, 443 U.S. at p. 14 [99 S.Ct. at p. 2619, 61 L.Ed.2d at p. 332].)

That brings us to the third factor in *Mathews*, the governmental interest involved. The statewide program for water quality control is designed to ensure the health, safety and welfare of all Californians. (§ 13000.) Cleanup and abatement orders serve an important function in meeting this goal. Section 13304, subdivision (a), provides in relevant part: "Any person who has discharged or discharges waste into the waters of this state in violation of any [WDR] . . . or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board, clean up the waste or abate the effects of the waste, or in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts."

The need for immediate action to clean up or abate waste discharge is obvious: Unlawful discharges threaten public health and safety, and pose significant risk to the environment. The state need not wait until injury actually occurs; it may act to prevent or minimize the harm. (See *Tahoe-Sierra Preservation Council v. State Water Resources Control Bd.* (1989) 210 Cal.App.3d 1421, 1440 [259 Cal.Rptr. 132]; *Freeman v. Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408-409 [95 Cal.Rptr. 852].) To require a preorder hearing would delay remedial action and exacerbate a dangerous situation.

In sum, the weighing of interests in this case establishes that due process was provided to the Dairy.

This conclusion comports with previous decisions of the State Board, such as order No. WQ 86-13, *In the Matter of the Petition of BKK Corporation*, adopted August 21, 1986. In that case, BKK Corporation also contended that due process required a hearing before the issuance of a cleanup and abatement order. The State Board rejected this claim, noting the Porter-Cologne

Water Quality Control Act did not provide for such a hearing. Instead, "[t]he Legislature intended to provide a summary procedure, through the issuance of cleanup and abatement orders . . . by which threatened or continuing water quality problems could be remedied promptly." (Order No. WQ 86-13, p. 4.)

The State Board explained the statutory procedures were consistent with due process, noting a discharger could seek changes or comment on a cleanup and abatement order once it issued. If the regional water quality board was not responsive, the discharger could petition the State Board for review. Judicial review of the State Board decision was also available. (Order No. WQ 86-13, *supra*, p. 5.)

The State Board found these procedures to be "more than adequate to provide due process," and held: "In view of the strong public interest in protecting water quality, and the need for a procedure allowing for expeditious action to cleanup or abate water quality problems, we conclude that the state's interest in prompt issuance of cleanup and abatement orders is sufficiently compelling to uphold the procedures provided for [in] the Porter-Cologne Act." (Order No. WQ 86-13, *supra*, pp. 6-7.)

We agree. The Dairy's right to due process was not compromised.

II*

*Terms of the Order*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

III

*Fifth Amendment Concerns*

■ The Dairy asserts that, by requiring the disclosure of specified information, the cleanup and abatement order potentially infringes on the Dairy's Fifth Amendment right against self-incrimination.

This claim is premature. The Dairy does not specify exactly whose Fifth Amendment rights are being violated, nor does it assert that an actual violation is threatened. "[A] person who claims that government demands for information will violate his privilege against self-incrimination must submit to the demands and expressly invoke the privilege in response to

---

*See footnote, *ante*, page 720.

specific matters. [Citations.] Because [the Dairy has] not alleged any claim that the [cleanup and abatement order] conditions were improperly applied in an actual case, we dismiss this challenge as unripe." (*Trustees for Alaska v. E.P.A.* (9th Cir. 1984) 749 F.2d 549, 560.)

Moreover, the Dairy's claim is not well founded. Cases in which reporting requirements have been struck down as violating the Fifth Amendment involve activities permeated with criminal statutes or directed at a group of persons inherently suspected of criminal activities. These cases also involve an immediate or appreciable hazard of self-incrimination because the statutes were designed to discover involvement in prohibited activity. (See generally *United States v. Flores* (9th Cir. 1985) 753 F.2d 1499, 1501-1502, and cases discussed therein.) That is not the situation here.

The Porter-Cologne Water Quality Control Act is not criminal in nature; it is designed to protect water quality and its focus is primarily regulatory. (Cf. *Craib v. Bulmash* (1989) 49 Cal.3d 475, 489 [261 Cal.Rptr. 686, 777 P.2d 1120].) Its provisions are not designed for the primary purpose of punishment, but are instead intended to protect the environment and ensure the safety of the general public. (See § 13000.) Nor are these provisions directed to an inherently suspect group. Discharging waste, if done in accordance with WDR's, is a perfectly legal activity; it is only if those requirements are violated that penalties attach.

*California v. Byers* (1971) 402 U.S. 424 [91 S.Ct. 1535, 29 L.Ed.2d 9] lends support to this conclusion. In that case, a plurality of the United States Supreme Court recognized that "[a]n organized society imposes many burdens on its constituents" (*id.* at p. 427 [91 S.Ct. at p. 1537, 29 L.Ed.2d at p. 27]), and, as an example, noted "industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere." (*Id.* at p. 428 [91 S.Ct. at p. 1538, 29 L.Ed.2d at p. 17].) The court explained that, in this situation, "there is some possibility of prosecution—often a very real one—for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. . . . But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by [such a] statute[]. . . ." (*Ibid.*)

"[T]here is a difference between using the privilege [against self-incrimination] as a shield against inquisitorial and unfair government practices and using it as a sword to carve a path through the laws of the land." (*United States v. Flores, supra,* 753 F.2d at p. 1503.) The Fifth Amendment does not insulate the Dairy from the reporting requirements of the cleanup and abatement order.

## DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Raye, J., concurred.

On July 12, 2001, the opinion was modified to read as printed above.