Heriberto BALDERAS
CORTEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–86–01165–CR.

Court of Appeals of Texas,
Dallas.

July 28, 1987.

1. All references to the rules herein are to the Texas Rules of Appellate Procedure.

Renie McClellan, Cedar Hills, for appellant.

Michael A. Klein, Dallas, for appellee.

Before DEVANY, BAKER and McCRAW, JJ.

DEVANY, Justice.

Heriberto Balderas Cortez appeals his conviction for murder. The case was tried before a jury and appellant was sentenced to life confinement in the Texas Department of Corrections and a $10,000 fine. In two points of error, appellant contends that (1) the trial court erred in failing to include the instruction on parole required by TEX. CODE CRIM.PROC.ANN. art. 37.07 § 4(a);

and (2) the trial court erred in not granting appellant's motion for mistrial on the basis of newly discovered evidence offered prior to the jury's verdict on punishment. Because we find no merit in these contentions, we affirm the judgment of the trial court.

In his first point of error, appellant contends that the trial court erred by not including the instruction on the parole law required by TEX.CODE CRIM.PROC. ANN. art. 37.07 § 4(a) (Vernon Supp.1987). We disagree, for two reasons.

■ First, appellant waived any error on this point. When the trial court was preparing the charge, he asked appellant's attorney specifically whether he wanted to have the parole law instruction included. After a somewhat lengthy exchange with the court, appellant's attorney stated that he had no objection to the charge. Therefore, error, if any, was waived. *Jefcoat v. State*, 644 S.W.2d 719, 724 (Tex.Crim.App. 1982).

■ Second, in the absence of a showing of harm, a trial court's failure to include the parole instruction is not fundamental error. *Estes v. State*, 723 S.W.2d 753, 754 (Tex.App.—Austin 1986, no pet.); *Hyde v. State*, 723 S.W.2d 754 (Tex.App.—Texarkana 1986, no pet.). Appellant does not argue in his brief that he was harmed by the omission of the instruction on parole. Therefore, appellant's first point of error is overruled.

In his second point of error, appellant contends that the trial court erred in not granting appellant's motion for mistrial on the basis of newly discovered evidence. In order to fully address this point of error, it is necessary that we discuss the rather bizarre facts of this case as adduced at trial.

Appellant was charged with the murder of John Sullivan. The testimony at trial indicated that the body of the deceased was found on Wheatland Road at about 10:30 p.m. on June 11, 1986. The cause of death was seven gunshot wounds to the back of the head. A bloody blue bandanna, a pair of mangled eyeglasses, and some small pearl-white buttons were found at the scene. The deceased was wearing a pullover shirt at the time of his death, and the buttons did not match his shirt.

The deceased's car was found abandoned on R.L. Turner Freeway. The car had blood stains on the driver's seat, indicating that the deceased was killed while sitting in that seat. Also found in the car were spent .25 calibre automatic cartridges. The car was dusted for fingerprints, and an available print was compared with those of appellant and appellant's wife, Anna Cortez; however, both comparisons achieved negative results.

When the deceased's best friend, Steve Steed, identified the body, he told police that the deceased had been with appellant the night of his death. The investigation then centered upon appellant and his wife as the suspects in the killing. Approximately two months after the killing, an anonymous phone call informed police that appellant and his wife were staying at the Southern Comfort Motel, and the two were arrested.

The primary witness for the State was Anna Cortez, the appellant's wife. Anna testified that she and the appellant were married May 13, 1986, and had one child. On June 11, 1986, the couple was living with Anita Cortez, the appellant's mother, and several other family members in a house on Bluecrest. She testified that John Sullivan and appellant had been friends for two years, and that Sullivan sometimes came by and picked up the appellant. On June 11, 1986, Sullivan telephoned appellant at his home. Sullivan came by to pick appellant up around 8:30 p.m. or 9:00 p.m. Anna testified that she talked to Sullivan when he arrived, and, when appellant joined them, the three of them went riding with Sullivan driving, Anna in the front passenger seat, and appellant in the back seat behind Sullivan. They drove up along Wheatland Road, where Sullivan parked the car and asked them if they wanted to smoke a "joint." They sat, smoked, and talked.

Anna testified that she turned to look out the window and then heard several gun-

shots, and looked and saw John Sullivan leaning toward her, dead. She testified that appellant shot Sullivan. The appellant then opened the driver's door and dragged the body across the road and left it there. Anna testified that they then took the car to a car wash and tried to remove all signs of blood from the car, both inside and out. After they had washed the car, they drove it and then abandoned it. She testified that appellant threw the gun away somewhere near the car wash. However, two months later, when she took Detective Hammer to find the gun, it was not there.

She further testified that, after they threw the gun away, they went to Sullivan's apartment. In the bedroom, the appellant pried open the dresser drawer and found about $5.00 worth of quarters. She identified the State's Exhibits 14 and 15, respectively, as pictures of the desk from which the appellant removed a screwdriver, and the dresser drawer he had pried open with the screwdriver. She stated that the appellant was searching the apartment. They left the apartment and went to the home of the appellant's grandmother, Beatrice Sanchez. The appellant admitted to his grandmother that he had killed John Sullivan. Anna also testified that the appellant then called Sullivan's apartment and left a message on the telephone answering machine. After they left the grandmother's house, they returned home and appellant then admitted to his mother that he had killed John Sullivan.

Anna testified that Robert Cortez, the appellant's brother, also knew what had happened. Robert then took Anna and the appellant back to the grandmother's, but Anna and the appellant decided to stay at a motel for a couple of days. They moved around continuously until they were arrested on August 22, 1986.

Anna testified that after they were arrested she gave a statement to Detective Hammer. She identified the mangled eyeglasses found at the scene of the murder as belonging to John Sullivan. She also identified the bloody blue bandanna found at the scene as belonging to appellant. Anna further testified that appellant was wearing a button-down shirt the night of the killing.

She further testified that the appellant told her that she was to give him an alibi for the night of the killing to the effect that he was home watching television with his mother, Anita, and Robert and Annette, Robert's wife. She stated that she had agreed to give him the alibi because she was afraid of him.

On cross-examination, Anna testified that Detective Hammer placed her in jail for violation of probation and for the murder of Sullivan. After she made her statement, the murder charge was dropped. However, she stated that no one promised to help her with her probation violation if she testified. She also stated that she was not out with Tony Gracia the night of the murder; however, she did admit spending the night in a motel with Gracia a few months before the killing. She stated that she was not jealous of the appellant's friendship with Sullivan. Finally, she testified that John Sullivan had been a marijuana dealer.

Another witness for the State was the appellant's uncle, Antonio (Tony) Gracia. Gracia testified that on the Saturday following the killing, the appellant talked to him at Gracia's house. The appellant's brother, Robert Cortez, was also at Gracia's home. During the conversation, appellant admitted to them that he killed John Sullivan on a road in south Dallas by shooting him five or six times. The appellant's uncle further testified that while appellant was telling this story, he was laughing and bragging about it. He also testified that appellant called Detective Hammer and told him that Gracia wanted to talk to him. The uncle later gave a statement to that detective while he, the uncle, was incarcerated for an aggravated robbery charge which was pending against him. That charge was later dropped. The appellant's uncle admitted on cross-examination, however, that he still had several other criminal charges pending against him. He testified that he gave a statement to the detective about appellant because appellant was telling people that he, Gracia, had killed the

deceased. The uncle also testified that he was a former heroin user, and that he had met the deceased, but had never bought drugs from him. The uncle also admitted telling some family members that he was having an affair with Anna, the appellant's wife. He also admitted buying clothes for Anna that were worth $600.00. He admitted that he had taken the appellant and his wife to Euless to hide from the police. On redirect, he testified that he had given appellant $600.00 to allow him to go to bed with his wife.

Steve Steed also testified for the State. Steed testified that he and John Sullivan were best friends. On the day of the murder, Steed spent several hours with Sullivan, and then left him at his apartment around 7:45 p.m. At that time, John Sullivan told him that he was going to go pick up the appellant and then return to his apartment before 10:00 p.m. Steed stated that he returned to the apartment before 10:00 p.m. and found a note from John on the door, but John was not home. He stated that he did not know whether the door was locked at that time, but that John was fanatical about locking the door. Steed waited for John until about 11:00 p.m., but then went home and went to bed.

Steed further testified that the next morning he called the apartment, but only reached John's telephone answering machine. Steed testified that, after calling several times, he concluded that Sullivan had not returned home the previous night. After he left work at 7:30 p.m., later that day, he drove to John's apartment and found the door slightly ajar. He called two friends to come to the apartment. Eventually, he called the morgue, and went to identify Sullivan's body. He subsequently returned to John's apartment where he received a call from Robert Cortez, the appellant's brother. Steed testified that he asked Robert and the appellant to come to the apartment that evening, and they did. While at the apartment later, appellant acted very upset about Sullivan's death. Steed stated that the appellant and John Sullivan were lovers, but that their relationship had been off and on for about three years.

Steed testified that he had gotten Detective Hammer's phone number at the morgue. He called Detective Hammer and arranged to meet him the next morning at the morgue. Steed testified that, after the murder on Wednesday night, he talked to the appellant on several occasions, including the Thursday night when the appellant and his brother had come over to Sullivan's apartment. He also testified that on the following Saturday, the appellant and his brother met him at a convenience store to pick up a picture of John and a pair of his eyeglasses which the appellant often wore. He then testified that Robert Cortez and Sullivan were also lovers.

On cross-examination, Steed testified that the appellant and Sullivan sometimes got into heated arguments over drug transactions. He stated that the appellant was responsible for introducing John Sullivan to Tony Gracia, but that Sullivan had problems dealing with him and did not want to continue. Steed also testified that Sullivan had backed out of two different drug deals when he saw that Gracia was to be involved.

On redirect examination, Steed testified that, shortly before Sullivan was killed, the drug deals between Sullivan, the appellant, and Robert Cortez were going bad more frequently. He also testified that he and John were afraid of Tony, not because of personal experience, but because of what appellant and his brother, Robert, had told them.

The next witness was Dr. Patrick Besant-Matthews, a Deputy Chief Medical Examiner for Dallas County. Dr. Besant-Matthews testified concerning the autopsy which was performed on John Sullivan. Sullivan's most prominent injuries were seven gunshot wounds to the back of the head received from a small caliber weapon. The deceased also had scrape marks upon his back, which would be consistent with the body being dragged across asphalt pavement. He also testified that it would be consistent with the location of the wounds to assume that the victim was seat-

ed in the front seat of the car and was shot by someone in the back seat of the car.

Robert Cortez, appellant's brother, testified for the defense. He testified that he and appellant often met with John Sullivan two or three times a week either at a bar or at his house. He stated that, to his knowledge, the appellant and Sullivan were friends and that he knew of no problems between them. He learned of Sullivan's death while he was at Sullivan's apartment the day after he and Steed had reported him missing. He testified that, on the night of June 11, 1986, he was at his mother's house on Bluecrest in Dallas. Several other family members were also present, including appellant and his wife, Anna. At 10:00 p.m., Robert left to go to Garland. At that time, the appellant and Anna were both still at the house. Robert, his wife, and daughter came back to his mother's house at about 1:00 a.m. When he returned, appellant was in bed, but appellant's wife was not at home. Robert further stated that Anna arrived home at about 1:15 a.m. Robert's wife also testified about the events on the night of the murder, and her testimony corroborated Robert's.

Robert also testified that, before John Sullivan's death, he had never heard the appellant and Sullivan argue, nor did he hear appellant threaten Sullivan. He did not recall being a part of a conversation with Antonio Gracia and the appellant concerning Sullivan's death on the Saturday after the killing. Robert then testified that Anna Cortez, appellant's wife, was seeing Tony Gracia on an on-and-off basis before she went to jail. He stated that he had heard Tony Gracia and Anna threaten Sullivan. He testified that he had heard Anna say she would kill Sullivan one day because he and appellant were seeing too much of each other. Appellant and his wife had arguments over this issue on several occasions. He further testified that Tony Gracia had a drug problem and that he was still using drugs at the time of trial. He also stated that he had seen Gracia with a .25 caliber weapon as well as several other weapons, and that Gracia does not

have a reputation for being an honest, law-abiding citizen.

Rita Cortez, appellant's fourteen-year-old sister, also testified for the defense. She testified that appellant's wife, Anna, had twice contacted her from jail, once by telephone and once by mail. During the telephone conversation she tried to persuade Rita not to tell anyone that on Wednesday night, the night of the murder, she had left her mother-in-law's house after appellant had fallen asleep, supposedly to go to her mother's house. Rita called that house that night fifteen minutes after Anna left, but Anna was not there. Anna arrived back at her mother-in-law's some time after Robert and his wife did.

The State again called Anna Cortez in rebuttal. Anna denied that she had asked Rita Cortez to keep her whereabouts on June 11, 1986, a secret. She identified State's Exhibit 35 as a letter she received from appellant, asking her to get a notary public and change the statement she had given to Detective Hammer.

The prosecutor read pertinent portions of the letter to the jury. The letter basically asked Anna to change her statement and say that she gave the statement because she was afraid of Detective Hammer. In the letter, appellant stated, in pertinent part:

All I ask of you is that you not take the stand and testify against me if the D.A. and Hammer can prove that I murder John then you let them prove it. Don't let them use you to prove it for them.... Because without your testimony against me, they don't got nothing. If you want for us to go back together as a family then the only way we are gonna win this case is if you don't testify on me.... It's up to you if we win or lose this case.

The State also called Beatrice Sanchez, appellant's grandmother. She testified that one night, somewhere between June 11, 1986, and August 22, 1986, the appellant and his wife came to her house and the appellant admitted killing a friend of his. On cross-examination, she testified that she had bought a pistol for her son, Antonio Gracia. She testified that Tony had tossed

the gun away one night because the police had scared him. She also testified that Tony used drugs.

The State also called Brook Busbee, the last of the State's witnesses in rebuttal. Ms. Busbee testified that she was the attorney representing Anna Cortez. She testified that Robert Cortez had told her that he and his mother had come down "to tell the truth about this case;" namely, that appellant had murdered John Sullivan. On cross-examination, she testified that after Robert Cortez made that statement, she brought him to an assistant district attorney, Steve Miller. She also testified that no one else heard the conversation between herself and Robert Cortez.

After this testimony, both the defense and the State rested and closed. The court prepared the charge to the jury, and both sides presented their closing arguments. The jury recessed for deliberations, and found appellant guilty of murder. The next day, after all the evidence had been heard concerning punishment, and after each side had closed their case, but before both sides had presented their arguments, appellant's attorney stated that he had another witness: the appellant's mother, Anita Cortez. However, the appellant's mother had not yet arrived at the courtroom. The appellant's attorney determined from appellant's family that Anita was on her way. At that point, appellant's attorney made the following motion outside the presence of the jury:

> Your Honor, at this time I would like to make a motion for mis-trial [sic] on the following basis, which is that last night I learned of some new evidence that could at least make a difference as to the punishment in this case and that is I received a phone call at approximately midnight from the Defendant's mother, Anita Cortez, who tells me that she knows where the murder weapon is and the Complainant's wallet. She indicated to me on the phone that those items were given to her by——or she was told about those items by Anna Cortez, and that Anna Cortez told her that she was the one who had planned this killing and had fired the shots that killed John Sullivan. I do not know exactly where the murder weapon is, because I was waiting for her to arrive so I could talk to her about that and put that testimony on and see if it would make some difference as to the outcome or result or trial of this case. And because of the materiality of that evidence I would ask the Court perhaps first to allow her time to arrive so that I could put her testimony on and then grant a mis-trial.

At the conclusion of this motion, a discussion ensued between the defense counsel and the court. The court determined that the defense was not at fault in failing to discover the testimony earlier. After this discussion, the court called the jury back in, and both sides presented their closing arguments in the punishment phase. At some time during these proceedings, Anita Cortez arrived. After the jury retired to deliberate punishment, the trial judge heard testimony from Anita Cortez over the objection of the State.

Anita Cortez, the appellant's mother, stated that she had called appellant's attorney the night before, and told him that she couldn't sleep because she had been crying and she had to "get it off [her] chest that [she] knew the truth of what happened to John Sullivan." She stated that she had told appellant's attorney that she knew who had killed Sullivan and where the weapon and his wallet were. She testified that Anna Cortez, her daughter-in-law, had sold the murder weapon to "a wetback or an alien or whatever." That Anna sold the gun to the man in her house, for $50.00, about a week after the killing. Anita also stated that the gun was now in Pleasant Brook, with Jose, but that she didn't know how to find Jose because he didn't live there anymore. She also testified that she had John Sullivan's wallet, not with her, but that she knew how to get it. Anna had given her the wallet when she called her (Anita) to go pick them up at the motel. Anita testified that Anna called her to pick them up at the motel the night "when they killed John Sullivan." She stated that the word "they" meant the appellant and Anna. The motel was on Camp Wisdom,

Interstate 35, on the corner. Anna gave Anita the gun and the wallet when she got to the motel. Anita had the gun for three or four days. When Anita was asked if she had any other evidence connected with the case, Anita stated, "[j]ust that I went to where his body was—to it." She testified that, the night of the killing, she went to the road where the body was, with the appellant. She testified that she talked to the appellant and Anna about how John Sullivan was killed. Appellant's attorney asked her what they told her, and she responded, "[w]ell, they seemed to be very hyperactive or very nervous, and I asked them why they did it, and Anna said that —." At this point in the proceedings, one of the prosecutors interrupted and requested that the court appoint an attorney for Anita Cortez, because her testimony had criminal implications. The court appointed an attorney for Anita; after she consulted with him, she returned to the witness stand, and stated that she did not wish to testify any further, but wished to exercise her "fifth amendment" right not to incriminate herself. At the end of this part of the proceedings, the trial court overruled appellant's motion for a mistrial.

■ After reviewing the bizarre testimony of this case, the question before us is whether the trial court erred in denying appellant's motion for mistrial. First, we must determine whether we may consider the motion as proper. The grounds for appellant's motion were that he had obtained newly discovered evidence. Under TEX.R.APP.P. 30(b)(6), an accused is entitled to a new trial "where new evidence favorable to the accused has been discovered since trial." This rule became effective September 1, 1986, before the trial in the instant case. Since defendant's motion for "mistrial" relies upon the ground of newly discovered evidence, it effectively requested the court to set aside the verdict of guilt and grant a new trial. Under TEX.R. APP.P. 30(a), a new trial is defined as "the rehearing of a criminal action after a finding or verdict of guilt has been set aside upon motion of an accused." Hence, in the interest of justice, we shall consider substance over form and address the appel-lant's motion for what it sought to do: achieve a new trial for the appellant. Where a motion states grounds that would entitle an accused to a new trial, and where the context of the motion shows that the accused desires a new trial, the motion is to be considered a motion for new trial, regardless of whether it is actually denominated a "motion for new trial." *Spivey v. State*, 140 Tex.Crim. 107, 143 S.W.2d 386, 387 (1940).

■ Next, we consider whether the motion was timely. Under the new appellate rules, a motion for new trial may be filed "prior to, or shall be filed within 30 days after, date sentence is imposed or suspended in open court." TEX.R.APP.P. 31(a)(1). The definition of a new trial, as stated earlier, is a rehearing of a criminal action "after a *finding* or *verdict* of guilt has been set aside upon motion of an accused." TEX.R.APP.P. 30(a). In the instant case, the motion was made after the jury's verdict of guilt, but before punishment was determined and sentence imposed. We hold that the motion was timely.

■ Our next consideration is whether the trial court abused its discretion in overruling appellant's motion. Overruling a motion for new trial based upon newly discovered evidence is not an abuse of discretion unless the record shows: (1) that the evidence was unknown to the movant before trial; (2) that the defendant's failure to discover it was not due to a lack of diligence on his part; (3) that its materiality was such that it is probably true and that it would probably bring about a different result on another trial; and (4) that it was competent, not merely cumulative, corroborative, collateral or impeaching. *Bolden v. State*, 634 S.W.2d 710, 711–12 (Tex. Crim.App.1982).

■ In the instant case, the record reveals that the trial judge himself concluded (1) that the evidence was unknown to appellant before trial, and (2) that his failure to discover it was not due to a lack of diligence. The appellant's attorney had talked to Anita Cortez a number of times before trial, but she had never given him

this information. Therefore, the only remaining questions are (3) whether it was probably true and whether its materiality was such that it would probably bring about a different result on another trial; and (4) whether it is competent evidence, not merely cumulative, corroborative, collateral, or impeaching.

We will first examine the first prong of the third criteria: whether the testimony given by appellant's mother was "probably true." If she had completed her testimony and stated that Anna Cortez was the one who planned the murder and actually committed it, that testimony would have been in conflict with the testimony of Anna Cortez' attorney, Brook Busbee. As stated earlier, Busbee testified that Robert and his mother approached her and Robert told her that he and his mother were here "to tell the truth": that appellant was the one who murdered John Sullivan. Anita's statements about what happened the night of the killing was also contradicted by Anna Cortez' testimony and by the testimony of several others. The trial judge was free to believe Anna and the other witnesses and disbelieve Anita. *Bolden*, 634 S.W.2d at 712.

The second prong in the third criteria is whether the materiality of the evidence is such that it would probably bring about a different result on a new trial. Appellant has not established this criteria. The jury already knew from Anna's testimony that she was present at the murder, and the jury could have concluded that she was seriously involved from the testimony given at trial. Appellant's mother's testimony included the phrase "the night *they* killed John Sullivan," indicating that both the appellant and Anna were involved in the killing. Furthermore, the statements that Anita gave before invoking her fifth amendment right did not contradict the testimony of appellant's grandmother, who stated that appellant told her he had killed one of his friends. Antonio Gracia also testified that appellant told him he had killed John Sullivan. The letter appellant wrote his wife from jail also strongly implies appellant's guilt, because the appellant was arguing that the only way he

could win the case was if Anna did not testify against him. The statements that Anita gave before she decided to exercise her fifth amendment right not to testify do not exculpate appellant in the least; in fact, they further implicate him as one of the people who killed John Sullivan. Therefore, we are not persuaded that a new trial including this testimony would bring about a different result.

We next consider the fourth criteria: whether the testimony is competent, not merely cumulative, corroborative, collateral, or impeaching. The statements simply give a somewhat different version of what happened the night of the killing. They do contradict Anna's testimony to some extent, and, therefore, could be used to impeach her. However, after a careful review of the facts, we are not persuaded that Anita Cortez' statements were more than merely cumulative, corroborative, collateral, or impeaching.

We are persuaded that appellant has failed to establish the four elements necessary to show that the trial judge abused his discretion in denying a motion for new trial based on newly discovered evidence.

■ Another argument appellant raises under this point of error is that the trial court erred in allowing Anita Cortez to exercise her fifth amendment right once she had begun to testify. In support of this proposition, appellant cites *Draper v. State*, 596 S.W.2d 855 (Tex.Crim.App.1980). In *Draper*, the Court of Criminal Appeals held that, once a witness had related part of the facts of a transaction, he should not have been permitted to assert his fifth amendment privilege to prevent disclosure of additional relevant facts. 596 S.W.2d at 857. We agree with this general proposition, but conclude that it must be placed in proper context with more recent case law concerning waiver of the fifth amendment right. In *Grayson v. State*, 684 S.W.2d 691 (Tex.Crim.App.1984), the Court of Criminal Appeals further refined the law in this area. In *Grayson*, the defense called Janice Joiner, a woman who was present in the house at the time that Grayson alleg-

edly shot police officers who were conducting a drug raid. Joiner was also under indictment as a result of the same incident. The judge retired the jury, put Joiner on the stand, and asked her whether she wished to testify. Joiner stated that she would rather take the fifth amendment; however, the court kept her on the stand to permit the defendant's attorney to make a bill of exceptions. Joiner answered a few questions concerning her name and address, and one question about where she was in the house at the time of the drug raid. The court then asked her whether she was aware that if she answered any questions about the event, she would give up her fifth amendment right. Joiner stated that she was not aware that if she answered one question, she would be required by law to answer the rest of the questions. The court then asked her if she still wished to answer the questions for the jury, and she said that she did not. When the jury was brought back in, Joiner thereafter invoked her fifth amendment right in response to five questions.

On appeal, Grayson argued that Joiner had waived her fifth amendment right by beginning to testify about the events in question. The Court of Criminal Appeals held that Joiner had not waived her rights. The court cited the two-prong test given in *Klein v. Harris*, 667 F.2d 274, 287 (2nd Cir.1981), that a waiver of the fifth amendment privilege should be inferred from a witness' prior statements only if "(1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination." *Grayson*, 684 S.W.2d at 695, *quoting Klein v. Harris*, 667 F.2d at 287. The *Grayson* court held that, since Joiner's testimony was outside the presence of the jury, the jury would not be misled by having only a partial knowledge of the facts. Therefore, the jury would not have a distorted view, and Joiner did not waive the privilege. 684 S.W.2d at 695.

In the instant case, Anita Cortez was testifying outside the presence of the jury, after the verdict of guilt had been decided. Her incomplete testimony, therefore, could not have left the jury with a distorted picture of the events in question. Secondly, it is apparent from the record that Anita Cortez had no idea that she could be waiving her fifth amendment rights. As soon as she was advised by an attorney, she promptly invoked her rights. We are persuaded that Anita Cortez did not waive her right against self-incrimination, and, therefore, that the trial court did not err in permitting her to invoke that right. *Grayson*, 684 S.W.2d at 695. Appellant's second point of error is overruled.

The judgment of the trial court is affirmed.