**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dimas CAMPOS–SERRANO,
Defendant-Appellant.**

No. 17645.

United States Court of Appeals,
Seventh Circuit.

June 25, 1970.

Rehearing Denied Oct. 1, 1970.

John J. Cleary, John D. Shullenberger, Chicago, Ill., for appellant.

Thomas A. Foran, U. S. Atty., Eugene Robinson, Chicago, Ill., for appellee, John Peter Lulinski, Chicago, Ill., Asst. U. S. Atty., of counsel.

Before HASTINGS, Senior Circuit Judge, and KILEY and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Defendant Dimas Campos-Serrano was indicted for violation of 18 U.S.C. § 1546, knowing possession of a forged alien registration receipt card. He was tried without a jury and was found guilty. From this verdict, he appeals.

On November 19, 1968, agents of the Immigration and Naturalization Service (INS) conducted an investigation of an area in the City of Chicago where it was suspected that aliens who were improperly in the country were working. Agents Jacobs and Burrow having arrested Manuel Rico, accompanied him to his apartment in order that he could obtain his personal belongings. When they arrived at the apartment, the defendant Campos-Serrano opened the door. The agents explained that Rico had been arrested but was being allowed to gather up his clothing. Agent Jacobs asked the defendant where he was from and when he said Mexico, Jacobs asked for identification. The agent was given an alien registration receipt card and a Social Security card. He was also asked for his passport but he said it was in Mexico, Jacobs examined the alien registration receipt card and showed it to Agent Burrow. The documents were returned to the defendant and the agents left with Rico. Outside the apartment Burrow stopped Jose Rodriguez Ortiz. Upon questioning, he produced an alien registration receipt card which was altered. Agents Burrow and White accompanied Ortiz to his apartment to obtain his personal property, which was the same place Rico and the defendant lived. Upon entering the apartment, Burrow asked the defendant to produce his alien

registration receipt card a second time. Burrow examined the card further under better light and discovered it was altered. The defendant was arrested. Defendant moved for suppression of the alien registration receipt card on the grounds that he was not advised of his constitutional rights and the motion was denied.

 Defendant attacks the indict-. ment on the grounds that 18 U.S.C. § 1546 does not apply to forged alien registration receipt cards because an alien registration receipt card is not an "immigrant or non-immigrant visa, permit or other document required for entry into the United States." 18 U.S.C. § 1546. We disagree. In 1924, Congress passed a statute which provided for the issuance of temporary reentry permits to facilitate the departure of aliens who were leaving the United States on a temporary basis. Act of May 26, 1924, ch. 190, § 10, 43 Stat. 158. The permits were to be surrendered upon return. Section 22 of the 1924 Immigration Act provided penalties for forging immigration visas and permits. *Id.* § 22, 43 Stat. 165. The reentry permits were included in the definition of permit by statute. *Id.* § 28(k), 43 Stat. 169.

Alien registration receipt cards were first issued under the Immigration Act of June 28, 1940. Act of June 28, 1940, ch. 439, § 31, 54 Stat. 673–674. Further, the same statute authorized the use of border crossing identification cards as entry documents. *Id.* § 30, 54 Stat. 673. In 1946, the alien registration receipt card was changed by regulation to include the same information as was contained in a Resident Alien's Border Crossing Identification Card and either was accepted upon entry into the country. 17 Fed.Reg. 4921 (May 30, 1952).

In 1948, Section 22 was repealed but was reenacted in modified form as 18 U.S.C. § 1546, which provided in part: "Whoever knowingly forges, counterfeits, alters, or falsely makes any immigration visa or permit * * *." The INS regulation stated:

(h) The term "permit to enter" means an immigration visa, a reentry permit, a passport visa, a transit certificate, a limited-entry certificate, a border crossing identification card, or a crew-list visa, issued by a permit-issuing authority.

8 CFR 175.41 subpara. (h) (1952).

An alien registration receipt card is included in this definition since it could be used as a reentry permit. In 1952, 18 U.S.C. § 1546 was modified such that "immigrant or non-immigrant visa, permit, or other document required for entry into the United States" was substituted for "immigration visa or permit." In so doing, Congress was expanding the definition of forged documents being used to enter the United States. Since alien registration receipt cards were being used for entry previously, we think it was Congress' intention that they be included in § 1546. We do not think it was necessary for the statute to include "reentry" as well as entry permits. Section 22 of the Act of 1924 included reentry permits within the definition of "permit" and we find no clear intention on the part of Congress to diminish this definition. Rather, we find that Congress intended to expand the scope of documents being covered in 18 U.S.C. § 1546.

 We do not accept the argument of the defendant that Congress sought to cover possession of forged alien registration receipt cards in 8 U.S.C. § 1306(d). Section 1306(d) covers the acts of counterfeiting and forging the cards while § 1546 is directed to their use for the purpose of entering the United States illegally. Further we find no support for the defendant in Lau Ow Bew v. United States, 144 U.S. 47, 12 S.Ct. 517, 36 L.Ed. 340 (1892), where the Supreme Court was specifically concerned with the Chinese Exclusion Act of 1882. To the extent that McFarland v. United States, 19 F.2d 807 (6th Cir. 1927), implies a different result, we disagree. See United States v. Mouyas, 42 F.2d 743, 744 (S.D. N.Y.1930).

We conclude that indictment under 18 U.S.C. § 1546 for possession of a forged alien registration receipt card was proper.

■ Defendant claims that the agents failed to give him *Miranda* warnings, Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), before asking him to produce his alien registration card the second time. For *Miranda* to apply, the documents or papers must be protected by the fifth amendment. United States v. Webb, 398 F.2d 553, 556 (4th Cir. 1968), and this is the initial inquiry we must make.

`■■ An alien 18 years and older is required to have in his possession "any certificate of alien registration or alien registration receipt card" at all times. 8 U.S.C. § 1304(e). In Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), the Court concluded that the fifth amendment privilege does not apply to documents which are kept in the normal operation of the business and also required to be kept for examination under the Emergency Price Control Act. The Court in Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed. 2d 889 (1968), declined to reassess *Shapiro* but rather distinguished it on the basis that the three elements discussed in *Shapiro* were not satisfied: (1) "obliged to keep and preserve records 'of the same kind as he has customarily kept'"; (2) "public aspects;" and (3) " 'an essentially non-criminal and regulatory area of inquiry.' " *Marchetti, supra,* at 57, 88 S.Ct. at 707. Alien registration receipt cards are not customarily kept. If the government did not require possession of the cards, aliens would not keep them in their normal course of affairs since they are not business records. Further, the cards do not come within the phrase "public aspects." The suggested meaning of "public aspects" is records which are usually known to the public in general rather than records which are essentially personal to the individual. The Supreme Court, 1967 Term, 82 Harv.L.Rev. 95, 201 (1968).

The compulsion that is constitutionally forbidden is a coercion which forces the individual to give open manifestation to thoughts or conduct that would not ordinarily be expressed in a concrete form available to a significant number of people. Thus, for purposes of defining the limits of the privilege against self-incrimination, the determining factor is whether the information sought is of such a nature that it would come into independent existence in the absence of government compulsion.

Note, Required Information and the Privilege Against Self-Incrimination, 65 Col.L.Rev. 681, 694 (1965).

Cards which disclose whether an individual is an alien are private and the fact that public officials may require that they be kept does not make them public. Marchetti v. United States, *supra,* at 57, 88 S.Ct. 697; The Supreme Court, 1967 Term, *supra.* As to the last element, alien registration receipt cards fall in the non-criminal regulatory area of inquiry. The purpose is essentially for the government to be aware of the number of aliens in the country and their status. *Cf.* Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965).

■ Since the purpose of these cards is non-criminal, the fifth amendment privilege should not prevent production in the normal immigration inquiry situation. *Cf.* United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927). Here, the initial inquiry to determine whether the defendant was properly in this country did not violate his fifth amendment privilege. However, when the inquiry itself is directed at determining a criminal violation such as in this case where the agents are looking for forged "cards" and the defendant's card had previously been examined, the privilege should apply. An individual should not be compelled to produce the crime itself. Otherwise, it would be the same as the agents compelling the individual to say: "I did it." Here, produc-

tion of a forged card was sufficient without more to convict the defendant of possession of forged entry documents under 18 U.S.C. § 1546 and the defendant's fifth amendment protection should have been respected by the agents.

The government contends that the "card" is not testimonial evidence but physical evidence under Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Physical evidence in those cases includes evidence which is used for the purpose of identification of a defendant. Since the two justifications for the fifth amendment privilege are "(1) preservation of official morality, and (2) preservation of individual privacy * * *" McKay, Self-Incrimination and the New Privacy, The Supreme Court Review—1967, at 193, 214, physical evidence is not protected. In Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Court held that private papers subject to a subpoena were protected by the fifth amendment. Such papers might contain some sort of personal confession of a defendant and are different from handwriting exemplars which may be used to identify a defendant but may not be admitted for their content. To force an individual to produce papers which are unknown to the public would violate his right of privacy. An alien registration receipt card is similar to the private papers in *Boyd.* As we said previously, the cards do not fall within the framework of "public aspects" as used by the Court in *Marchetti.* Here, introduction of the forged card which was in defendant's possession is *prima facie* evidence of violation of 18 U.S.C. § 1546 and the only effective evidence defendant could produce in rebuttal would be for him to testify. Thus, he is being forced to waive his fifth amendment privilege. See The Supreme Court, 1966 Term, 81 Harv.L.Rev. 112, 116–17 (1967).

In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court held that an individual must be advised of his constitutional rights when the interrogation is custodial in nature. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. Custodial interrogation may occur outside the surroundings of a police station as in Orozco v. Texas, 394 U.S. 324, 326–327, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), where the defendant was questioned by police officers in his bedroom at 4:30 in the morning. In Dickerson v. United States, 413 F.2d 1111 (7th Cir. 1969), this court held that *Miranda* warnings must be given at the beginning of an Internal Revenue Service criminal investigation.

> We understand the teaching of *Miranda* to be that one confronted with governmental authority in an adversary situation should be accorded the opportunity to make an intelligent decision as to the assertion or relinquishment of those constitutional rights designed to protect him under precisely such circumstances. * * * [I]t is the very fact that the taxpayer is not informed of the pendency of a criminal investigation which aggravates the dilemma in which he finds himself. Unaware of the possible consequences of his cooperation with the agents, he may nevertheless believe that he is obligated to supply the necessary information in order to satisfy any possible tax deficiency which he may owe.

413 F.2d at 1114–1116.

We think that the case before us falls in between the custodial interrogation in *Orozco,* and the non-custodial interrogation in *Dickerson.* Here the defendant was asked to produce his card a second time by the same agent. At both times, the agents were accompanied by a roommate of the defendant who was in custody of the agents and who was told to gather up his belongings. We think that the

circumstances created an overbearing atmosphere which was sufficient to satisfy the requisite degree of compulsion required by the fifth amendment. Miranda v. Arizona, *supra*.

For the foregoing reasons we think that the defendant should have been given *Miranda* warnings before he · was asked to produce his alien registration receipt card a second time. Since the warnings were not given, the forged card should not have been admitted into evidence. Therefore, we reverse and remand this case to the district court for further proceedings consistent with this opinion.

We wish to thank Mr. John J. Cleary, as court-appointed counsel, who was assisted on the brief by Mr. John D. Shullenberger, for their excellent service to the court in behalf of the defendant appellant.

Reversed and remanded.