550 A.2d 1135
**In re MAURICE M.**
**No. 50, Sept. Term, 1988.**
Court of Appeals of Maryland.
Dec. 19, 1988.

George M. Lipman, Asst. Public Defender and George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, José Felipé Anderson, Asst. Public Defender, Robin Parsons, Asst. Public Defender, all on brief) Baltimore, for appellant.

Ralph S. Tyler, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Andrew H. Baida, Asst. Atty. Gen., and Marilyn Blimline, all on brief), Mitchell Mirviss of Legal Aid Bureau, Inc., Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

This case involves a challenge on Fifth Amendment self-incrimination grounds to the constitutionality of a civil contempt order entered by a Juvenile Court directing the mother of a juvenile "to produce him before the court or to reveal his exact whereabouts."[1]

---

**1.** The Fifth Amendment provides, in pertinent part:
"[N]or shall [any person] be compelled in any criminal case to be a witness against himself...."
This provision is applicable to the States through the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 3, 84 S.Ct. 1489, 1490, 12 L.Ed.2d 653 (1964).
Article 22 of the Maryland Declaration of Rights is in *pari materia* with the Fifth Amendment provision. *See Richardson v. State,* 285 Md. 261, 265, 401 A.2d 1021 (1979) and *Ellison v. State* 310 Md. 244, 259–260, n. 4, 528 A.2d 1271 (1987).

I

Maurice M., the infant son of Jacqueline Bouknight, was admitted to the hospital on January 23, 1987, with a broken leg; he was then three months old. Because of the nature of Maurice's injuries, and the presence of old, partially healed fractures, the Baltimore City Department of Social Services (DSS) obtained an authorization on February 11, 1987 to provide shelter care for the child and he was placed in foster care. DSS also filed a petition in the Circuit Court for Baltimore City (Division of Juvenile Causes), seeking a determination that Maurice was a child in need of assistance (CINA) under the provisions of Maryland Code (1984), § 3–801(e) *et seq.* of the Courts and Judicial Proceedings Article. The petition recited Maurice's history of injuries, the mother's history of emotional problems, her own former status as a CINA, the fact that she was seen to throw Maurice into his crib during his second hospitalization, that she was verbally abusive to the physicians and social workers, and that the father had just been released from prison for drug violations. At a hearing on May 19, 1987, Maurice, Jacqueline, and DSS, each represented by counsel, stipulated to the essential facts as set forth in the petition and agreed to continue Maurice under the Shelter Care Order. On July 17, 1987, this order was modified and physical custody of Maurice was returned to Jacqueline.

At a hearing on August 18, 1987, Maurice was found to be a CINA. The parties agreed that Maurice would remain in Jacqueline's custody but would be placed under an Order of Protective Supervision to DSS and a DSS aide was assigned to assist Jacqueline with parenting skills. Under this order, Jacqueline agreed to "cooperate" with DSS, and to refrain from physically punishing Maurice.

By petition filed on April 18, 1988, DSS represented that Jacqueline had failed to cooperate with DSS and that she refused to provide a current address or to inform DSS of Maurice's whereabouts. The petition also recited that Maurice's father had been shot to death the previous month and that Jacqueline now had a history of drug use. DSS also

filed a Motion for Contempt against Jacqueline, alleging that DSS representatives had made a home visit on April 7, 1988, but were told by Jacqueline that Maurice "was in the care of an aunt; however, she refused to identify the aunt or provide the whereabouts of the child." [2]

On April 20, 1988, at a hearing before a Juvenile Master, at which Jacqueline declined to appear, DSS cited Jacqueline's failure to comply with the Order of Protective Supervision and was awarded custody of Maurice. On the same day, the court (Angeletti, J.) held a hearing on the contempt motion; neither Maurice nor Jacqueline appeared at the hearing although each was represented by counsel. DSS suggested to the court that it was dealing with a "very serious abuse case" because of Maurice's prior history of injuries, and he might even be dead. The court stated its belief that the child may be "in some jeopardy because of the actions of the mother in refusing to bring him in." At the conclusion of the hearing, the court ordered Jacqueline to show cause why she should not be held in contempt for failure to produce Maurice in court.

Jacqueline was subsequently arrested and brought before the court on April 27, 1988. At that hearing, the court (Mitchell, J.) engaged Jacqueline in a colloquy in the presence of her attorney. It asked her "the whereabouts of ... Maurice." In response, Jacqueline said that he was with her sister Barbara at a designated address in Dallas, Texas. Jacqueline's statement was not given under oath and no Fifth Amendment objection to the court's inquiry was entered on Jacqueline's behalf.

An immediate police investigation revealed that Jacqueline's sister had not seen Maurice. On April 28, 1988, Judge Mitchell found Jacqueline in contempt "for failing to pro-

---

**2.** There was evidence that DSS representatives had not seen Maurice since September 4, 1987; that the DSS aide's efforts to see Maurice were thwarted by Jacqueline's statements that the child was not at home; and that Jacqueline had told police that Maurice was in the care of an aunt, but that the aunt had denied seeing Maurice.

duce [Maurice] before the court or to reveal his exact whereabouts." The order specified that Jacqueline be jailed until she purged herself of the contempt by (1) producing Maurice before the court, or (2) revealing to the court his exact whereabouts, or (3) by providing "information" about Maurice to the police, or DSS, or the court.

The court also conducted a hearing on the same day it entered its civil contempt order. At the hearing, Jacqueline's counsel told the court that Jacqueline "absolutely insists" that the child was with her sister in Texas. Counsel also told the court that Jacqueline's opportunity to purge herself was not a constitutional one "if her purging herself may involve admitting to a crime of some sort." The court, in response, said that Jacqueline was not being asked "to admit to anything"; that Jacqueline was not being asked "what has happened to the child or whether she committed any act that in anyway harmed the child"; and that the only thing that is required is that she produce Maurice. The court added that Jacqueline could purge herself of the contempt "through the means of a proper address, person, or location for the child," *i.e.*, by simply indicating to her counsel, "to anyone at the jail, or anyone in authority, including this Court, that information."

At yet another hearing on May 18 before Judge Mitchell, Jacqueline moved to strike the contempt order on Fifth Amendment grounds. She claimed that the substance of the contempt "is that [Jacqueline] must verbally or physically produce statements or evidence that may tend to incriminate her." The court rejected the argument, concluding that it had jurisdiction to require disclosure of "the whereabouts of the minor child" and, in doing so, Jacqueline was not required to speak.

On May 26, 1988, a further hearing was granted on the Fifth Amendment issue. Jacqueline contended that to purge herself of the contempt she must "give testimony or speak" in violation of her self-incrimination privilege; that "the product of her mind has to yield the whereabouts of Maurice[;] ... she has to speak to someone, ... to order

some agent, through his mind, through his lips to produce Maurice." The court once again stated its view that its order to produce Maurice required only that Jacqueline perform an act—that no testimony need be given. It said that the contempt order was issued "not because she refuses to testify ... [but] because she has failed to abide by the Order of this Court, mainly the production of Maurice."

Jacqueline appealed. We granted certiorari prior to decision by the intermediate appellate court to consider the important issue raised in the case.

## II

■ The Fifth Amendment privilege against self-incrimination extends "to compelling answers by parties or witnesses in civil litigation." *Whitaker v. Prince George's County*, 307 Md. 368, 385, 514 A.2d 4 (1986). It "protects a witness from being required to make disclosure, otherwise compellable in the trial court's contempt power, which could incriminate him in a later criminal prosecution." *Id.* at 385, 514 A.2d 4. *See also In re Criminal Investigation No. 1–162*, 307 Md. 674, 516 A.2d 976 (1986). The privilege "is confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). To sustain the privilege, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered, might be dangerous because injurious disclosure could result." *Id.* at 486–87, 71 S.Ct. at 818. The protection of the Fifth Amendment "not only extends to answers that would in themselves support a conviction ... but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute" the suspected offender. *Id.* at 486, 71 S.Ct. at 818. The privilege must be accorded a liberal construction in favor of the right that it was intended to secure. *Id. See also Ellison v. State*, 310 Md. 244, 528 A.2d 1271 (1987).

■ It is the historic function of the Fifth Amendment to protect an individual from compulsory incrimination through his own testimony. *United States v. White*, 322 U.S. 694, 701, 64 S.Ct. 1248, 1252, 88 L.Ed. 1542 (1944). In *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966), the Court held that the privilege protects an accused "only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Id.* at 761, 86 S.Ct. at 1830. The Court said that the protection of the privilege "reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers." *Id.* at 763–64, 86 S.Ct. at 1832.

The question in *Schmerber* was whether the involuntary withdrawal of blood and the use of the analysis in a drunken driving prosecution infringed the Fifth Amendment privilege. In concluding that it did not, the Court emphasized that the privilege "is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate [the privilege]." *Id.* at 764, 86 S.Ct. at 1832. Citing prior precedents, the Court said that the privilege "offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Id.* Quoting from *Holt v. United States*, 218 U.S. 245, 252–53, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910), the Court observed, *id.* 384 U.S. at 763, 86 S.Ct. at 1832, that the privilege against self-incrimination protects an individual from being a witness against himself; it is a prohibition "of the use of physical or moral compulsion to extort communications [from an accused], not an exclusion of his body as evidence when it may be material." Stated in other terms, "our accusatory system of criminal justice demands that the government seeking to punish an individual pro-

duce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966).

*Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), involved a summons directing an attorney to produce documents of a client; the question was whether the documents were constitutionally immune from summons in the hands of the client and retained that immunity in the hands of the attorney. The Court concluded that the client's Fifth Amendment privilege was not violated by enforcing the summons against the lawyer since the client was not thereby compelled to be a witness against himself. It said that the constitutional privilege "does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a *testimonial* communication that is incriminating." *Id.* at 408, 96 S.Ct. at 1579 (emphasis in original). The Fifth Amendment, the Court emphasized, protects against " 'compelled self-incrimination, not [the disclosure of] private information.' " *Id.* at 401, 96 S.Ct. at 1576, quoting from *United States v. Nobles,* 422 U.S. 225, 233, n. 7, 95 S.Ct. 2160, 2167, n. 7, 45 L.Ed.2d 141 (1975). It observed that it is the extortion of the information from the accused that offends our sense of justice. *Id.* 425 U.S. at 398, 96 S.Ct. at 1574–75. However, it continued, while a party is privileged from producing evidence, the party has no privilege from its production. *Id.* at 399, 96 S.Ct. at 1575.

At issue in *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (*Doe I*) was whether, and to what extent, the Fifth Amendment privilege applied to concededly incriminating business records of a sole proprietorship. There, the sole proprietor was ordered by a grand jury subpoena to produce his business records. The Court recognized that a subpoena that demands production of voluntarily prepared documents does not compel oral testimony nor require the subpoenaed party to restate or affirm

the contents of the documents. *Id.* at 610–11, 104 S.Ct. at 1241. Quoting from *Fisher, supra,* 425 U.S. at 409–10, 96 S.Ct. at 1580–81, it observed that merely because records on their face might be incriminating would not violate the privilege since the privilege protects only against being incriminated by the individual's own compelled testimonial communications. *Id.* 465 U.S. at 611, 104 S.Ct. at 1241. The Court said, however, that while the contents of the records may not be privileged, the act of producing the documents may be because the individual may thereby be compelled "to perform an act that may have testimonial aspects and an incriminating effect." *Id.* at 612, 104 S.Ct. at 1242. This may be so, the Court explained, because compliance with the subpoena tacitly concedes the existence of the demanded records, their possession or control by the party under subpoena, as well as the authenticity of the records. *Id.* at 613, 104 S.Ct. at 1242. Noting the factual determination of the trial judge that "the act of producing the documents would involve testimonial self-incrimination," *id.* at 613–14, 104 S.Ct. at 1242, the Court, declining to overrule that factual determination, held that the act of producing the documents was privileged. *Id.* at 617, 104 S.Ct. at 1244–45.

In *Doe v. United States,* —— U.S. ——, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988) (*Doe II*), a court order compelled the defendant, the target of a grand jury investigation, to execute consent forms authorizing foreign banks to disclose records of his accounts, without identifying the accounts or acknowledging their existence. The defendant claimed that the compelled execution of the consent forms had "independent testimonial significance" that infringed his Fifth Amendment privilege against self-incrimination. 108 S.Ct. at 2345. In concluding that the privilege was not thereby violated, the Court reviewed its earlier *Fisher* and *Doe I* cases, stating that there the issue "was whether the act of producing subpoenaed documents, not itself the making of a statement, might nonetheless have some protected testimonial aspects." *Id.* at 2347. In those cases, the Court

concluded "that the act of production could constitute protected testimonial communication because it might entail implicit statements of fact: by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic." *Id.* at 2347. It said that the constitutional privilege "applies to acts that imply assertions of fact." *Id.* at 2347. The *Doe II* Court said that "to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information [because] [o]nly then is a person compelled to be a 'witness' against himself." *Id.* at 2347. This understanding, the Court said, was most clearly revealed in those cases in which it had held "that certain acts, though incriminating, are not within the privilege, citing *Schmerber, supra* (suspect may be compelled to furnish a blood sample); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (providing a handwriting exemplar); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (providing a voice exemplar); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (to stand in a lineup); and *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910) (to wear particular clothing). As to these, it said that the privilege was not implicated because the suspect was not required to disclose any knowledge he might have or to speak his guilt. The privilege may be asserted "only to resist compelled explicit or implicit disclosures of incriminating information." *Id.* 108 S.Ct. at 2348. Thus, the Court held that the defendant's execution of the consent form was without testimonial significance "because neither the form, nor its execution, communicates any factual assertion, implicit or explicit, or conveys any information to the Government." *Id.* 108 S.Ct. at 2350. It said that the form did not identify any particular bank, did not acknowledge that an account was in existence, or that it was controlled by the defendant. And assuming that such an account did exist, the form did not indicate whether information relating to the defendant was present at the

bank. Therefore, the Court explained that it was for the Government to locate that evidence by its independent labors. Accordingly, the Court concluded that the defendant's "compelled act of executing the form has no testimonial significance" because by signing the form, the defendant "makes no statement, explicit or implicit, regarding the existence of a foreign bank account or his control over any such account [n]or would his execution of the form admit the authenticity of any records produced by the bank." *Id.*

The defendant's act of executing the form was, therefore, not compelled to obtain any knowledge which he possessed in violation of the Fifth Amendment privilege.

The Supreme Judicial Court of Massachusetts, in *Com. v. Hughes*, 380 Mass. 583, 404 N.E.2d 1239 (1980), concluded that a court order directing the defendant in a criminal case to produce a designated gun suspected of having been used in the commission of the offense violated the defendant's Fifth Amendment privilege. There, the defendant, charged with assault with a handgun, refused to comply with the order that he produce the weapon or show present inability to do so. The gun had been legally registered to the defendant; the prosecution wanted it for ballistics testing. After recognizing that the defendant, without uttering a sound, could comply with the order by producing the weapon, the court nevertheless held that the defendant's producing the revolver would have sufficient testimonial aspects to initiate Fifth Amendment consideration. After reviewing *Schmerber* and *Fisher*, it recognized two kinds of "testimonial assertions" that were implied in the production of the gun, *i.e.*, (1) a tacit admission of the existence and location of the weapon in the hands of the possessor and (2) implicit authentication that the weapon was that required to be produced by the order. *Id.* 404 N.E.2d at 1243. In finding that the defendant's privilege had been infringed, the court said, *id.* at 1244, that "[i]f the defendant should produce the revolver, he would be making implicitly a statement about its existence, location and control" which would be used to prove his possession and control of the weapon after the

alleged crime was committed. The identical result was reached on markedly similar facts in *Goldsmith v. Superior Court In & For Shasta,* 152 Cal.App.3d 78, 199 Cal.Rptr. 366 (1984).

*United States v. Campos–Serrano,* 430 F.2d 173 (7th Cir.1970) involved a criminal charge of knowing possession of a forged alien registration card. There, because the defendant had been coerced into producing the card during a custodial interrogation, the court found a violation of the privilege against self-incrimination, reasoning that the defendant's act of compelled production implicitly admitted the card's existence, location, and the defendant's control over it. The court said: "An individual should not be compelled to produce the crime itself." *Id.* at 176. In *State v. Dennis,* 16 Wash.App. 417, 558 P.2d 297 (1976), the defendant was convicted of possessing cocaine. The police coerced the defendant into producing bags of the illegal drug. The court found a violation of the Fifth Amendment privilege because the act of production virtually admitted the defendant's control. In *State v. Alexander,* 281 N.W.2d 349 (Minn.1979), the court reversed a contempt adjudication which had been based on the defendant's failure to produce film which allegedly was possessed in violation of a criminal obscenity statute. The court concluded that the act of production was tantamount to an admission of the defendant's control or possession of the film.

## III

As earlier observed, Maurice is a CINA whose custody has been awarded to the DSS. In response to the court's directive that Bouknight release Maurice to DSS, she has refused to do so, insisting that he is with her sister in Texas, information which has proven to be incorrect. The State readily acknowledges that it is fearful that Maurice has been criminally abused or possibly is dead. In the circumstances, as disclosed by the record, the State concedes that Bouknight has a reasonable apprehension that she will be prosecuted if, in complying with the court's

order, she produces Maurice in court or otherwise discloses his whereabouts to the authorities.

The State is, of course, mandated to protect Maurice as a CINA under the Juvenile Causes Act, Code (1984 Repl.Vol.) § 4–101, *et seq.* of the Courts and Judicial Proceedings Article. That it does not know of Maurice's present whereabouts is equally clear. To purge the contempt order and thereby free herself from imprisonment, Bouknight must impart information to someone sufficient to permit Maurice to be produced in court, or provide information of his present whereabouts. Should she do so, Bouknight will necessarily admit a measure of continuing control and dominion over Maurice's person. In these circumstances, if the information discloses that Maurice is now dead, or has been subject to criminal abuse, as the prosecution candidly fears, suspicion concededly would focus on Bouknight as the criminal agent. By disclosing the demanded information, therefore, Bouknight would, in the event a crime had been committed upon Maurice's person, be incriminating herself by, in effect, disclosing the corpus delicti itself under compulsion of the court's order.[3]

In the circumstances of this case, the compelled act of producing Maurice in court, although not requiring Bouknight to utter a sound, or compelling her to verbally disclose Maurice's whereabouts, is implicitly at the least a testimonial communication within the contemplation of the Fifth Amendment privilege, as explicated by the controlling case law. Either by the act of producing Maurice in court, or verbally disclosing his whereabouts, Bouknight is compelled to communicate facts. We therefore find that the court's contempt order is, in its entirety, violative of Bouknight's Fifth Amendment privilege and must be vacated.

---

**3.** Section 3–831 of the Courts Article suggests that Bouknight's refusal to relinquish Maurice's custody to DSS is itself a crime, punishable by imprisonment up to three years.

(A)

In so concluding, we have considered the State's argument that Bouknight waived her Fifth Amendment privilege by providing information to the court as to Maurice's presence at a designated address in Texas. When she made the statement to the court, Bouknight was not a witness and she was not under oath. Although represented by counsel at the time, the record does not disclose that Bouknight was informed by counsel or the court of her right to remain silent in the face of the court's inquiry. Moreover, Bouknight's inaccurate information concerning Maurice's whereabouts was not directly incriminating; indeed, it was likely intended to exculpate her from further inquiry by the court.

Waiver of a constitutional protection is "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). It is difficult to establish and cannot be inferred from a silent record. *Barker v. Wingo*, 407 U.S. 514, 525–26, 92 S.Ct. 2182, 2189–90, 33 L.Ed.2d 101 (1972). To be valid, the waiver must be made knowingly, voluntarily and intelligently. *Miranda v. Arizona, supra; Younie v. State*, 272 Md. 233, 245, 322 A.2d 211 (1974). However, forfeiture of the Fifth Amendment privilege may be inferred from a course of conduct without any inquiry into intent. *See Minnesota v. Murphy*, 465 U.S. 420, 428, 104 S.Ct. 1136, 1142–43, 79 L.Ed.2d 409 (1984); *Klein v. Harris*, 667 F.2d 274 (2d Cir.1981). The Supreme Court has held that an "individual under compulsion to make disclosures as a witness who reveal[s] information instead of claiming the privilege [loses] the benefit of the privilege." *Garner v. United States*, 424 U.S. 648, 653, 96 S.Ct. 1178, 1181, 47 L.Ed.2d 370 (1976). *See also United States v. Korel*, 397 U.S. 1, 7–10, 90 S.Ct. 763, 766–70, 25 L.Ed.2d 1 (1970); *Adams v. State*, 200 Md. 133, 144, 88 A.2d 556 (1952). Thus, if a witness "discloses his criminal connections, he is not permitted to stop, but must go on and make a full disclosure." *Brown v. Walker*, 161 U.S. 591, 597, 16

S.Ct. 644, 647, 40 L.Ed. 819 (1896). But the loss of such a basic constitutional guarantee is not to be lightly inferred. *Emspak v. United States,* 349 U.S. 190, 196, 75 S.Ct. 687, 691, 99 L.Ed. 997 (1955); *Smith v. United States,* 337 U.S. 137, 150, 69 S.Ct. 1000, 1007, 93 L.Ed. 1264 (1949). A statement will not preclude a refusal to make further disclosures on Fifth Amendment grounds unless it directly inculpates the witness and the witness could reasonably be expected to know that he might have waived the privilege. *See Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951); *United States v. Singer,* 785 F.2d 228 (8th Cir.1986); *Klein v. Harris, supra.*

On the record before us, it is manifest that Bouknight's Fifth Amendment privilege remains intact and that her unsworn, nonincriminatory statement to the court was simply a lie. *See United States v. Singer,* 785 F.2d 228, 241 (8th Cir.1986); *Klein v. Harris, supra,* 667 F.2d at 288; *Balderas Cortez v. State,* 735 S.W.2d 294, 303 (Tex. App.–Dallas 1987).

### (B)

■ The State argues that if the Fifth Amendment applies, and the privilege has not been waived, the public right to protect its children, as manifested by the Juvenile Causes Act, outweighs Bouknight's constitutional right against self-incrimination.[4] Consequently, we are urged to strike the balance between Bouknight's right to silence, and the court's obligation to protect Maurice, in favor of the child. To do otherwise, it is said, would strip the Juvenile Court of its ability to protect any child suspected of being abused. The State points out that the court's action in holding Bouknight in contempt followed the statutory prescription of § 3–814(c) of the Courts Article that if a parent "fails to

---

4. This question was not raised or considered at the trial. Under Md. Rule 8–131, we may nevertheless, in our discretion, decide the question for the guidance of the circuit court or to avoid the expense and delay of another appeal.

bring the child before the court when requested ... [,] [it] may proceed against the parent, for contempt." On Maurice's behalf, his counsel says that virtually every CINA case involves some allegation of abuse or neglect which is potentially subject to criminal indictment; and that to apply the constraints of the Fifth Amendment in such cases is to afford the parent "carte blanche to conceal any negative information about the child's status despite explicit court orders to cooperate with agency officials." It is further suggested that in areas where, as here, the scope of state involvement is so extensive and that all citizens are expected to accept some risk of self-incrimination, individuals can be compelled to provide incriminating information, citing by way of example mandated production of tax records, securities filings, and other potentially incriminating vital records. Reliance is placed principally upon *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) and *United States v. Flores*, 753 F.2d 1499 (9th Cir.1985).

The issue in *Byers* was whether the constitutional privilege against compulsory self-incrimination was infringed by an essentially regulatory California statute which requires the driver of a motor vehicle involved in an accident to stop and give his name and address. The Court's plurality opinion said that "tension" exists between the State's demand for disclosures that may have an incriminating potential and the protection of the right against self-incrimination. *Id.* 402 U.S. at 427, 91 S.Ct. at 1537. These must be resolved, it said, "in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other." *Id.* It said that an organized society imposes many burdens on its constituents; it requires the filing of tax returns, that producers and distributors of consumer goods file informational reports on the manufacturing processes and the content of products, on the wages, hours, and working conditions of employees. It recognized that securities filings require informational reports and that industries must report periodically the volume and content of pollutants discharged into our waters

and atmosphere. *Id.* at 427–28, 91 S.Ct. at 1537–38. It noted that in each of these instances "there is some possibility of prosecution ... for criminal offenses disclosed by or deriving from the information that the law compels a person to supply." *Id.* at 428, 91 S.Ct. at 1537. But, the plurality continued, the mere possibility of incrimination, rather than a substantial possibility, is insufficient to defeat the strong policy in favor of a statutory reporting requirement. *Id.* It said that disclosure with respect to automobile accidents did not entail a substantial risk of self-incrimination; that the California statute was not intended to facilitate criminal prosecutions but to promote satisfaction of civil liabilities arising from automobile accidents; and that consequently the self-incrimination privilege was not violated by the reporting requirement.

*United States v. Flores, supra,* involved a statutory reporting requirement that written notice be given to a carrier whenever firearms were being shipped to an unlicensed person. The Court found no violation of the defendant's right against self-incrimination by reason of the reporting requirement. While recognizing that "the privilege against self-incrimination ... may only be limited for the most substantial of reasons," *id.* at 1500, the Court said that the Fifth Amendment

> "does not *always* demand substantial undercutting of valid and essential government regulation when the means to effect that regulation necessarily include disclosure of information which *could* lead to self-incrimination."

*Id.* at 1501 (emphasis in original).

In so holding, the Court pointed out that the statute was "directed at a universe of people," and did not operate in an area of activity "permeated with criminal statutes or directed at a group of persons inherently suspect of criminal activity." *Id.*

We think these cases are inapposite to the matter now before us. The State readily acknowledges that Bouknight's risk of incriminating herself is a substantial one,

encompassing, among other possible crimes, the felony of child abuse and even murder. While it may be argued that the Juvenile Causes Act absolutely requires that Bouknight produce Maurice in court or provide information as to his location, and thus bears some kinship to a statutory reporting requirement, we simply are unable in the circumstances to, in effect, totally expunge Bouknight's Fifth Amendment rights where the risk of prosecution is so substantial. Assuming, arguendo, that there may be causes in which a balancing test is appropriate to determine the existence of the Fifth Amendment privilege, we conclude that the case before us is not one of them. We accord the privilege a liberal construction, as we must, in favor of the right that it was intended to secure. *Hoffman v. United States, supra,* 341 U.S. at 486, 71 S.Ct. at 818. While we must vacate the civil contempt order in this case, we recognize that Bouknight's conduct may be criminally punishable under § 3–831 of the Courts Article.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO ORDER JACQUELINE BOUKNIGHT RELEASED FROM CUSTODY. MANDATE TO ISSUE FORTHWITH; COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.

McAULIFFE, Judge, dissenting.

### I.

When Maurice M. was three months old he was admitted to Francis Scott Key Medical Center for treatment of a fractured left leg. X-rays disclosed that he had previously suffered fractures of the right humerus, right scapula, and glenoid. Examination disclosed a right arm weakness, possibly attributable to a brachial plexus injury. Hospital birth records showed no indication of birth trauma. Nurses and others observing Maurice's mother at the hospital reported behavior changes, as well as inappropriate conduct toward the child, including shaking him and dropping him into his

crib when he was in a spica cast. The Baltimore City Department of Social Services (DSS) was notified of the suspected child abuse and, after investigation, filed a petition with the Circuit Court for Baltimore City, sitting as the juvenile court (the juvenile court), alleging that Maurice was a child in need of assistance (CINA). The juvenile court promptly ordered continuing shelter care, and granted DSS authority to place Maurice in foster care. Six months later the court found that Maurice was a CINA and placed him under an order of protective supervision with DSS. DSS, acting pursuant to specific authority granted by the juvenile court and pursuant to authority granted it under the order of protective supervision of the child, placed Maurice with his mother under a carefully structured agreement. Among other things, the mother agreed to cooperate with DSS, attend parenting classes, utilize the assistance of a parent aide provided by DSS, and refrain from corporal punishment of the child.

Eight months later, on April 18, 1988, DSS informed the court that the mother had ceased cooperating with it, had failed to make appropriate use of the parent aide, and had failed to attend parenting classes as required. Additionally, DSS informed the court that Maurice's father had been killed, and that the mother refused to produce the child or tell DSS representatives where he was. DSS feared for the safety of the child because of the above facts, the history of child abuse in the case, the mother's known use of drugs and current threats to kill herself, and the fact that Maurice had last been seen on March 23, 1988, and could not be located by either DSS or the police. Accordingly, DSS asked the court to immediately order the mother to produce the child. The DSS petition and a show cause order were served on the mother, but she did not appear for the scheduled hearing. The court issued an attachment for the person of the mother, and she was taken into custody. In answer to questions of the court psychiatrist, and in an unsworn statement made in open court, the mother said she had sent Maurice to Texas for a visit with the mother's

sister. At the hearing of April 28, the mother refused to produce the child or to inform anyone in authority of his whereabouts. She was thereupon held in contempt and ordered confined in the Baltimore City Jail until she purged the contempt by "either producing the [child] before the court, or revealing to the court[1] his exact whereabouts."

The majority holds that under these circumstances the mother cannot be required to produce the child. I respectfully disagree.

## II.

The thrust of the juvenile court's order was to require the mother to produce the child. That the order also contained alternative methods by which the mother could purge the civil contempt does not serve to implicate the Fifth Amendment if it is not implicated by the order to produce the child. As the juvenile judge made clear on several occasions, the juvenile court had determined that the child must be returned to shelter care,[2] and the mother was being ordered to produce and surrender the child for that purpose. The other methods of compliance offered by the court provided the mother with alternatives conceivably more convenient for her, but they were in no way compulsory. The mother could have purged, and can now purge, the contempt and secure her release by producing, or publicly or privately arranging for the production of, the child. Thus, it is the order to produce the child that is at issue here, and without discussing whether the result would be different if the order contained only a command to divulge the whereabouts of the child, I examine the impact of the Fifth Amendment upon the judicial command to produce the child.

---

**1.** A later paragraph in the order provided that furnishing information of Maurice's whereabouts to DSS or to the Baltimore City Police Department would also serve to purge the contempt.

**2.** As a result of the hearing of April 20, 1988, at which the mother did not appear, and on recommendation of the juvenile master, shelter care was ordered to DSS. No appeal was taken from that order.

## III.

As the majority opinion makes clear, the proper reach of the privilege against compelled self-incrimination extends beyond the spoken word. A person acceding to a court order to produce his records makes a silent statement when he does so: "these are my records, and I have sufficient current control or dominion over them to bring about their production." *See Doe v. United States*, 487 U.S. ——, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988) (Doe II); *Braswell v. United States*, 487 U.S. ——, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988); *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 1243 n. 13, 79 L.Ed.2d 552 (1984) (Doe I); *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). By publicly producing a child in response to the court order to produce Maurice, his mother would implicitly represent that: 1) the child produced is Maurice, and 2) she currently has sufficient control and dominion over Maurice to be able to produce him. Each of these implicitly asserted facts might be used against the mother in a criminal prosecution if the physical person of Maurice shows evidence of additional abuse. However, not all testimonial communications rise to a level of Fifth Amendment significance. An implicit assertion that communicates information may, under the circumstances of a particular case, represent little more than a "foregone conclusion," or may be "self-evident," or "a near truism," and therefore be of "minimal testimonial significance." *Fisher v. United States*, 425 U.S. 391, 411–12, 96 S.Ct. 1569, 1581, 48 L.Ed.2d 39 (1976)[3]. In discussing the problem of testimonial assertions implicit in the compelled production of documents, Professors Whitebread and Slobogin have observed:

> The act of producing documents should always be seen as "testimony" concerning the existence and location of

---

3. Compare the earlier language of *Albertson v. SACB*, 382 U.S. 70, 81, 86 S.Ct. 194, 200, 15 L.Ed.2d 165 (1965), that "[t]he judgment as to whether a disclosure would be 'incriminatory' has never been made dependent on an assessment of the information possessed by the Government at the time of interrogation...."

the documents, even if only "minimally" so, because it provides information beyond mere identification. Whether the Fifth Amendment can be asserted to bar their production should depend solely upon how incriminating these admissions are.... [T]his determination should entail an assessment of the extent to which the facts of existence and location (and, if relevant, authenticity and possession) are "foregone conclusions" which could be proven without using the implied admissions.

C. Whitebread and C. Slobogin, *Criminal Procedure,* § 15.06 at 354.

In determining whether the protections of the Fifth Amendment are implicated in the compelled production of this child, it is important to bear in mind that potentially incriminating information may come from two sources. First, there is the information that may be obtained from an examination of the person of the child. That information, which may turn out to be powerfully incriminating if there is evidence of recent abuse, is simply not within the protection of the Fifth Amendment—it is real and physical evidence and not testimonial evidence. *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

Second, there is testimonial evidence in the form of assertions implicit in the act of production; and it is these assertions, as potentially protected communications, which we must examine in light of the particular facts of this case. The first of these is the identification of the child. Under the facts here present, it is virtually certain that proof of identity exists and can be readily presented by the State without the necessity of any implied voucher by the mother. Putting aside the question of identification by modern scientific comparison techniques, or the probable

identification by neighbors or photographs,[4] it can hardly be doubted that positive identification could be established by comparison of current and previous x-rays. The number of documented fracture sites in the body of this two-year old child virtually guarantees identification. The potentially incriminating authentication becomes a matter of minimal importance in the context of this case.

The second and final testimonial assertion is that the mother currently has sufficient dominion and control over the child to be able to produce him. This, she says, could incriminate her should there be evidence of recent abuse. Again, I think the potential for incrimination[5] is more theoretical than real, and may not rise to the level of constitutional significance within the meaning of the Fifth Amendment.

The criminal charges reasonably feared in this case are child abuse, and possibly murder or manslaughter. Proof that the mother had actual dominion or control over the child at the time he was produced furnishes no evidence of who had physical custody of the child when criminal acts were committed, or who committed them. Moreover, it is self-evident that the mother had the *right* of day-to-day control over Maurice from the time he was placed with her by DSS until shelter care was again ordered. Although the establishment of control at the time of production might furnish a fact of assistance in the creation of a permissive inference of continuous control, that is not an essential element of proof in the criminal charges which might rea-

---

4. The record discloses that the State possesses at least one photograph of Maurice.

5. The child's attorney argues that the mother has it within her power to gain her release without publicly producing Maurice, thereby avoiding the implication of recent control. By arranging to have information of Maurice's whereabouts conveyed anonymously to DSS or to the police, Maurice could be located, and upon Maurice's appearance, the mother would have to be released. Because I prefer to address the question of the impact of this testimonial implication head-on, I make no comment on the validity of this argument.

sonably be predicted. Additionally, the mother had on at least two occasions freely admitted her continuing control of the child at the very times she was required to produce him. Given these admissions, at least one of which was made through her attorney, it is difficult to see how evidence of control resulting from the production of the child would have much, if any, incriminating value.

## IV.

I would not, however, rest the decision in this case upon a determination that the actual incriminatory value of the testimonial assertions implicit in production of the child is so limited as to be outside the protection of the constitutional privilege as a matter of law. Rather, having identified the limited testimonial assertions involved, and having distinguished them from the potentially powerful but constitutionally unprotected incriminating physical facts that may accompany production, I would weigh the incriminatory value of the implicit assertions against the State's legitimate and nonprosecutorial interest in the welfare of the child to determine whether the assertions rise to the level of constitutional protection. Put another way, in evaluating the true incriminatory weight of the implicit assertions to determine whether they are constitutionally significant, I would consider all relevant circumstances, including the significant societal interest in the welfare of the child.

Factoring the matter of societal interest into the equation for determining whether the testimonial effects of a compelled production shall be deemed to be within the protection of the Fifth Amendment is not a new concept. In *Albertson v. SACB.*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), the Supreme Court compared the compulsion involved in completing an income tax return as discussed in *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), with the compulsion involved in filing a registration statement as a member of the Communist Party:

In Sullivan the questions in the income tax return were neutral on their face and directed at the public at large, but here they are directed at a highly selective group inherently suspect of criminal activities. Petitioners' claims are not asserted in an essentially noncriminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime.

*Albertson,* 382 U.S. at 79, 47 S.Ct. at 199.

The following analysis and parsing of that language of *Albertson* is instructive:

This passage announces three inquiries to be made in determining whether a statutory request for information compels incrimination contrary to the respondent's Fifth Amendment rights:

(1) Is the statute directed at a selective group?

(2) Is that group inherently suspect of criminal activity?

(3) Does the statute deal with an area of the law permeated with criminal statutes?

C. Whitebread and C. Slobogin, *Criminal Procedure,* § 15.05 at 341.

Understandably, the *Albertson* test has been applied narrowly. *See, e.g. Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); *Marchetti v. United States, supra.* In *California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.E.2d 9 (1971), Chief Justice Burger stated in the plurality opinion that:

Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one. Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be

resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly. 402 U.S. at 427, 91 S.Ct. at 1537.

Justice Harlan, concurring in the judgment, and particularly addressing the question of whether a grant of use immunity was required to constitutionally compel the completion and filing of income tax returns, wrote:

Considering the noncriminal governmental purpose in securing the information, the necessity for self-reporting as a means of securing the information, and the nature of the disclosures involved, I cannot say that the purposes of the Fifth Amendment warrant imposition of a use restriction as a condition on the enforcement of this statute. To hold otherwise would, it seems to me, embark us on uncharted and treacherous seas. There will undoubtedly be other statutory schemes utilizing compelled self-reporting and implicating both permissible state objectives and the values of the Fifth Amendment which will render this determination more difficult to make. 402 U.S. at 458, 91 S.Ct. at 1553.

More recently, in *Braswell v. United States, supra,* the Court grappled with the impact of the *Fisher—Doe II* recognition of potentially protected testimonial assertions in the production of documents upon the earlier line of cases which generally removed documents of collective entities from Fifth Amendment protection. Recognizing that the act of production by a named officer of the corporation would necessarily produce implicit testimonial assertions of authenticity and control, and that such assertions had some potential to incriminate, the Court weighed a number of factors to determine whether the assertions were entitled to constitutional protection. In deciding that the assertions would be "deemed not to constitute self-incrimination," the Court considered the effect that a contrary decision would have upon the Government's strong interest in prosecuting certain criminal activity:

We note further that recognizing a Fifth Amendment privilege on behalf of the records custodians of collective entities would have a detrimental impact on the Government's efforts to prosecute "white-collar crime," one of the most serious problems confronting law enforcement authorities. (footnote omitted). *Braswell*, 108 S.Ct. at 2294.

Applying the teaching of *Albertson* and its progeny to the facts of this case persuades me that the statutory requirement of production, rooted as it is in the strongest possible public policy in favor of protecting children, clearly outweighs the limited cost of denying the application of the privilege to the testimonial assertions flowing from the act of production in this case. Section 3–814(c) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 1984 Repl.Vol.), which deals generally with children taken into custody, mandates the production of the child in these words:

> If a parent, guardian, or custodian fails to bring the child before the court when requested, the court may issue a writ of attachment directing that the child be taken into custody and brought before the court. The court may proceed against the parent, guardian, or custodian for contempt.

Although this portion of the statute may constitute no more than a declaration of the implicit or inherent authority of a juvenile court with regard to children who have been taken into custody and then placed with parents or others during continued court jurisdiction,[6] its existence gives clear notice to those who accept placement of children under such circumstances.

Although § 3–814(c) fairly may be said to be directed at a selective group, *i.e.*, parents, guardians, and custodians who accept placement of juveniles in custody, that group clearly is not "inherently suspect of criminal activity." Nor does

---

**6.** I need not, and expressly do not, consider whether the legislature intended § 3–814(c) to have a broader reach.

the statute deal with an area of the law "permeated with criminal statutes" within the meaning of *Albertson* and *Byers*. Certainly, there are criminal statutes dealing with child abuse and with contributing to the delinquency of minors, but the thrust of the juvenile laws of this State is not criminal, but protective. Maurice was taken into custody for his protection. Every effort of the juvenile court and DSS has been to further the best interests of the child and, if possible, to reunite him with his mother. Even in the face of evidence of child abuse, no criminal charges were brought. Viewing the entire history of this case in perspective, it cannot rationally be suggested that the motive of DSS in seeking a court order for the production of Maurice was to gain evidence for use in a criminal prosecution. Make no mistake, if Maurice's condition suggests he has been the victim of additional abuse, the State will no doubt conduct a full investigation, and if warranted, prosecute the offender. But there are two entirely different matters involved here. This is not a case of a request for production that is simply part of a criminal investigation. This is an order for production issued by the juvenile court as a necessary part of an ongoing child protection case. Criminal prosecution, if it occurs at all, would be entirely collateral to that major objective.

The gist of the *Albertson—Byers* principle is that a common-sense approach to the application of even the most important constitutional rights is appropriate. In a case like the one before us, where the incriminatory value of the testimonial component of production is, in light of all the circumstances and known facts, slight, and the statutory mandate for production is strong and deeply rooted in important and traditional state interests, it does no violence to the Fifth Amendment to require the mother to produce the child.

## V.

As an alternative ground for affirming the action of the juvenile court, I would hold that the mother waived her right to exercise the privilege as to the testimonial compo-

nent of production when she assumed custody of the child from the State.

In *Braswell*, the Court quoted from Justice Brennan's concurring opinion in *Fisher* that "one in control of the records of an artificial organization undertakes an obligation with respect to those records foreclosing any exercise of his privilege." 108 S.Ct. 2292. The *Braswell* Court, at 108 S.Ct. 2291 and 2289, also quoted from *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed 771 (1911):

> [B]y virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him. In assuming their custody he has accepted the incident obligation to permit inspection. *Wilson*, 221 U.S. at 382, 31 S.Ct. at 545.
>
> \*     \*     \*     \*     \*     \*
>
> The [State's] reserved power of visitation would seriously be embarrassed, if not wholly defeated in its effective exercise, if guilty officers could refuse inspection of the records and papers of the corporation. No personal privilege to which they are entitled requires such a conclusion.... [T]he visitatorial power which exists with respect to the corporation of necessity reaches the corporate books without regard to the conduct of the custodian.
>
> *Id.* at 384–85, 31 S.Ct. at 546.

If the visitatorial rights of the State with respect to the records of a corporation are sufficiently important to require that a person assuming custody over them does so with knowledge that the State's right of access will overcome the custodian's privilege regarding the act of production, how much greater must the State's rights be with respect to a child over whom it is exercising control? Moreover, the waiver of the right to avoid production, implicit in the case of custodians of collective entity records, was much more explicit here. The State had demonstrated

its interest in, and power over, the child by taking him from the mother and imposing continuing protective custody. The State "placed" the child with the mother, reserving protective supervision and imposing specific conditions on the placement, including the express agreement of full cooperation. I have no hesitancy in concluding that this mother, as would any other person assuming conditional custody of a child from a state under these circumstances, waived her right to claim the privilege as to testimonial assertions implicit in the act of production of the child, and may not now frustrate return of the child to the State's protective custody.

## CONCLUSION

I would affirm the judgment of the juvenile court. Although the period of confinement that the State may impose upon the mother for a constructive civil contempt is subject to limitation by the Eighth Amendment's prohibition against cruel and unusual punishment, and perhaps as well by the Due Process Clauses of the federal and state constitutions, no suggestion has been made that the constitutional limitation has been exceeded in this case.

RODOWSKY, J., joins in Parts I through IV of this opinion.